**UNIVERSITY HILL FOUNDATION, Plaintiff,**

v.

**GOLDMAN, SACHS & CO., Defendant.**

**No. 71 Civ. 1166.**

United States District Court, S. D. New York.

Oct. 27, 1976.

Regan, Goldfarb, Heller, Wetzler & Quinn, New York City, for plaintiff; Howard Breindel, Jan D. Atlas, Robert Aronson, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; Michael M. Maney, Philip L. Graham, Jr., Charles E. Dorkey III, New York City, of counsel.

LASKER, District Judge.

This suit raises important questions regarding the application of federal securities laws to the sale of commercial paper. It is one of a number of actions by persons who in the Spring of 1970 bought commercial paper issued by the Penn Central Transportation Company (Penn Central, or the Company) from the defendant, Goldman, Sachs & Co., which was the exclusive dealer in the securities.[1]

The plaintiff, University Hill Foundation (University Hill or the Foundation), purchased two notes in the aggregate face amount of $600,000. which were to mature on September 25, 1970. At maturity the notes were duly presented, but payment was refused for, as is well known, on June 21st the Company had filed a petition in bankruptcy. The Foundation alleges that in the sale of the paper Goldman, Sachs violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, and a variety of state statutes and the common law.[2] It is claimed that Gold-

man, Sachs falsely represented both that Penn Central was creditworthy and that Goldman, Sachs had performed an adequate credit investigation, and, further, that Goldman, Sachs omitted to disclose at least six items of information necessary to render the statements made not misleading. Specifically, Goldman, Sachs is charged with failing to disclose:

1) That one month before the sale, upon receipt of a negative financial report from Penn Central, the defendant reduced its inventory of this paper by $10,000,000. by selling it back to the Company;

2) That the "Prime" rating of Penn Central paper by the National Credit Office (NCO) was not based upon NCO's independent evaluation of the paper but upon Goldman, Sachs' decision to continue selling it;

3) That for seven months prior to the sale Goldman, Sachs had unsuccessfully attempted to get Penn Central to increase its bank line coverage for its commercial paper from 50% to 100%;

4) That prior to the sale a major banking institution had removed Penn Central from its list of approved issuers;

5) That Penn Central was in a very tight cash position, lacked working capital and was experiencing increasing losses; and

6) That Penn Central was using the proceeds from the sale of commercial paper to finance non-current transactions.

Finally, the Foundation asserts that in order to prevent the collapse of the commercial paper market, Goldman, Sachs engaged in a fraudulent scheme or course of conduct to withhold negative information about Penn Central until the Company should become financially sound. The Foundation seeks to rescind the sale.

1. See *In re Penn Central Securities Litigation,* 325 F.Supp. 309 (Judicial Panel on Multidistrict Litigation, 1971).

2. The Foundation asserts claims under §§ 25401 and 25402 of the California Corporate Securities Law, West's Ann.Corp.Code §§ 25401 and 25402 (1976 Supp.), New York General Business Law § 352–c (McKinney 1968) and alleges common law fraud and negligence as well. (Exhibit D, Pretrial Order) The 1st, 3rd and 10th claims for relief asserted in the complaint allege violations of additional sections of federal and state laws; they are not included in the Pretrial Order and have not been briefed. Accordingly, we consider those claims to be abandoned and they are dismissed.

Goldman, Sachs vigorously denies the allegations. According to it, the only representation it made was that at the time of the sale to the Foundation Goldman, Sachs reasonably believed Penn Central to be creditworthy, and it steadfastly continues to maintain that this statement was true. Conceding that the $10 million buy-back of its Penn Central commercial paper inventory could, when isolated from the business context, be interpreted to reflect negatively on its motives, Goldman, Sachs insists that there were sound business reasons for this transaction which had nothing to do with a loss of faith in the Company's paper. With regard to the NCO "Prime" rating, Goldman, Sachs argues that it had no reason to believe that the rating was not based on NCO's independent evaluation of the paper. As for the other alleged omissions, the defendant maintains that they were for a variety of reasons not material in the circumstances of this transaction.

The action was tried to the court without a jury. In addition to six full days of testimony the parties submitted numerous depositions and portions of the testimony in one of the related cases, *Franklin Savings Bank v. Levy, et al.,* 406 F.Supp. 40 (S.D. N.Y.1975). (*Hereinafter F.S.B. v. Levy.*) In order properly to evaluate the respective contentions of the parties it is necessary, in addition to discussing the facts of the sale here in issue, to describe the workings of the commercial paper market, Goldman, Sachs' role in that market as an exclusive dealer, and the interaction between Penn Central and Goldman, Sachs in the months preceding the sale.

## I.

### A. The Parties

The Foundation is a California non-profit corporation based in Los Angeles, primarily engaged in raising funds for Loyola University. In March, 1970, and for about two years prior to that time, Howard B. Fitzpa-

trick, an industrial paint contractor, served as the Foundation's President. He donated ten hours a week to the Foundation, where he had sole responsibility for its daily affairs and for its investments. The Foundation's only employee was a part-time secretary.

From time to time Fitzpatrick decided to purchase commercial paper for the Foundation. These investments were made through one of the Foundation's several banks. When contemplating such a transaction, it was his practice to contact the investment department of at least two banks, find out what paper was available and select the item which best fitted the Foundation's requirements in terms of safety, rate of return and maturity. (106) (Unless otherwise indicated, numbers appearing in parentheses refer to pages of the trial transcript.) He then communicated this decision to one of the banks, which handled the actual purchase of the paper. One of the institutions so employed by Fitzpatrick was the Union Bank of Los Angeles. The official there with whom he dealt was Noel G. LeMay, Vice President in charge of the short-term money market operations of the bank's investment division.

Goldman, Sachs is a partnership in the business of investment banking, underwriting, securities brokerage and related financial activities. Its principal office is in New York City and it maintains offices in Los Angeles as well as other major cities. Since its inception in 1869 Goldman, Sachs has been a dealer in commercial paper. At the time of the transaction in issue, Goldman, Sachs was the largest of six such dealers.[3] The partner in charge of the Commercial Paper Department was Robert G. Wilson. Wilson was responsible both for the daily buying and selling operations and for the decision to accept or terminate corporate clients who wished to issue commercial paper. This decision hinged in large part on Wilson's assessment of the financial condi-

---

**3.** In early 1970 there was approximately $40 billion worth of outstanding notes in the entire commercial paper market, about $25 billion of which was sold directly by the issuing compa- nies and $15 billion was sold via dealers. Goldman, Sachs handled 45% of all "dealer paper." (236–37)

tion of the issuer, or its creditworthiness, a term dealt with extensively below. In making an evaluation of creditworthiness Wilson placed heavy reliance on Jack A. Vogel, the Manager of the Credit Department, a sub-unit of the Commercial Paper Department. Vogel supervised the work of five credit analysts whose function was to assist in the initial investigation of prospective issuers, to monitor the financial condition of the issuers whose paper Goldman, Sachs sold and to put together information of credit significance for periodic distribution to commercial paper purchasers.

## B. The Commercial Paper Market and the Sale to the Foundation

The commercial paper market facilitates the flow of cash from lenders with temporary surpluses to borrowers with temporary deficits. Commercial paper consists of unsecured promissory notes usually having a maturity which does not exceed nine months. Corporations of sufficient size and reputation to attract purchasers of these general obligations can normally sell their paper at rates which enable them to meet their short-term borrowing requirements for less than they would have to pay for bank loans. The notes are sold on a discount basis and offer attractive short-term investment for corporations and others with substantial temporary cash excesses. The excesses must be substantial because paper is available only in large dollar units. (The average transaction involves $1 million (237), and in Penn Central's case, a $100,-000. note was a small sale. (See Defendant's Exhibit CU.))

Because of the large amounts involved buyers understandably desire to complete the transaction on the date of the sale to avoid losing a day's interest, (260-61) and since the actual mechanics of delivering the notes to the buyer's bank are somewhat cumbersome, the selling day is compressed into a two-and-a-half to three hour period from roughly 9:30 A.M. to 12:00 or 12:15 P.M. During this period the sales force at Goldman, Sachs alone puts together four to five hundred transactions, (274) virtually all of which are completed in a series of brief telephone conversations between the purchaser, the purchaser's agent, if he has one, a commercial paper salesman and a commercial paper buyer.

The transaction involved in this case was typical. (274) Fitzpatrick knew that the Foundation had a $600,000. investment about to mature in an account at Union Bank. He called LeMay to inquire what commercial paper was available with a maturity of approximately six months as a successor investment. LeMay, in turn, called several commercial paper dealers, including the salesmen at Goldman, Sachs' Los Angeles office, to ask what paper was for sale. (14–15) The Goldman, Sachs salesman mentioned three or four issues which met Fitzpatrick's requirements, called a commercial paper buyer in his department to verify that the notes were still on hand and then confirmed to LeMay that the paper was in fact available for sale. (253–55, 274) LeMay at that point reported back to Fitzpatrick and the latter, recognizing Penn Central as a "huge industrial company" and assuming it to be "as safe as the United State Government" (113) elected to take the Company's notes. Accordingly, LeMay placed the order with Goldman, Sachs. Just as Goldman, Sachs' salesmen were answering numerous calls, LeMay also was dealing with as many as a hundred inquiries from bank customers in the three hour selling period. (35) Each of the phone conversations was therefore short and to the point, lasting from thirty seconds to no more than several minutes.

Due to the compressed and somewhat hectic nature of the selling day, it is not the practice for salesmen to engage in lengthy discussions with prospective buyers regarding the financial status of the various issuers. Like securities salesmen everywhere, in the brief time available, they may communicate such information as they possess about their current stock and endeavor to answer specific queries with regard to particular facts of an issuer's financial condition. To assist them in this task the salesmen have ready access to various sum-

maries of credit information prepared by Goldman, Sachs' Credit Department designated respectively white sheets, yellow sheets and green sheets.[4] During the period in which these notes were sold the salesmen were informed daily by their superiors which particular issues were in plentiful supply in the Goldman, Sachs inventory. Because it was costly to maintain inventory, see 888–889 *infra*, the sales force was encouraged to make a strong effort to sell these issues. (267–70; Defendant's Exhibit DX. And see Frederickson Deposition, 39–41; Coleman Deposition 33–36)

If a prospective investor desires to base his decision on a detailed analysis of the soundness of a particular issuer, he must acquire the information and perform the analysis himself. Many large institutions which regularly invest in commercial paper follow this practice and maintain constantly revised approved lists which are strictly observed. Other investors choose to rely on what are thought to be ready indices of creditworthiness, such as a "Prime" rating by the NCO, a division of Dun & Bradstreet, or the percent of outstanding paper an issuer has covered with bank lines. (Bank lines are open lines of credit to be made available to pay off maturing paper in the event that the company is unable to do so by other means. They are discussed in more detail below.) Still other investors rely exclusively on the good name of the dealer from whom they buy in the belief that the decision of a reputable dealer to sell the paper of a particular issuer is sufficient evidence of reliability of the security.

Apart from the return rate and maturity date, Fitzpatrick's sole criteria in selecting

paper was safety. Accordingly, he had a clear understanding with LeMay that he was only interested in "quality" paper. He always insisted that the paper he bought be "prime", and he used the word in the "lay" sense. (109–10, 132) The instruction to LeMay, insofar as it resulted only in the purchase of paper rated "Prime" by the NCO, was unnecessary, because it was the policy of the Union Bank when buying for customers' accounts only to purchase "Prime" rated paper unless specifically instructed to the contrary by the customer. (5, 8, 29) Apart from the requirement of a "Prime" rating, however, LeMay relied entirely on the dealers' reputation in purchasing on behalf of customers. He was aware that Goldman, Sachs had a credit department which investigated issuers and he knew the defendant to be a "quality house." (65) So long as it was NCO prime, what was "good enough for Goldman, Sachs was good enough" for him. (67–69) The Goldman, Sachs salesmen with whom LeMay dealt knew, or were at least generally aware, that he was only interested in "Prime" rated paper. (8; see Coleman Deposition 112–14; Frederickson Deposition 91–92) On the date of the sale in question, LeMay asked no questions and sought no assurances about the Penn Central paper other than to note that it was NCO "Prime."

### C. Penn Central's Relationship with Goldman, Sachs

In February, 1968, the Pennsylvania Railroad merged with the New York Central Railroad to form the Penn Central Company.[5] The merged entity was the largest transportation company in the world. In

---

4. A white sheet contains a duplication of the issuer's annual reports for the two previous years. The yellow sheet provides general information about the issuer including a brief description of its business, certain key financial and sales data and a listing of its important banks. Yellow sheets are prepared annually, and supplemented as necessary by green sheets which provide news of important interim developments. Some investors request this data prior to purchasing a company's paper. The sheets are in any event sent along with the confirmation to all buyers. (251–53)

5. In October, 1969 the Company became the Penn Central Transportation Company, a wholly owned subsidiary of the newly-formed Penn Central Company, which was a publicly held holding company. Unless specific reference is made to the holding company, Penn Central as used in this opinion refers to the pre-October, 1969 entity of that name and its subsequent incarnation, The Penn Central Transportation Company, which was the issuer of the commercial paper.

addition to its vast railroad properties, the Company had extensive holdings in real estate, and its total assets were valued at more than six billion dollars. The two constituent companies had a history of financial difficulties and it was anticipated that the merger would facilitate a recovery by enabling substantial economies and providing a base for a broad diversification program. However, although hope for the future was high, it was generally expected that it would be several years before the trend of losses in the railroad business would be reversed.

Early in 1968, as part of the Company's plan to finance cash needs in the early years of its new life, Penn Central sought and obtained ICC approval to issue $100 million of commercial paper, and approached Goldman, Sachs, which had sold paper for the New York Central, to act as its dealer. Prior to accepting the Penn Central account Goldman, Sachs performed a credit analysis to assure that the Company was creditworthy, which is to say that it had the capacity to pay the notes as they matured. Essentially, such an analysis requires examination of a company's access to cash in the near future either through anticipated earnings, lines of bank credit, anticipated long-term financing or assets which can be readily pledged or sold. (554–55; 565–70; 857)

In view of the extraordinary size and complexity of the merged corporation, and also of the fact that it was an untried entity comprised of two very troubled organizations, Vogel assumed primary responsibility for the analysis himself. (556–57) From time to time over a period of months he reviewed the available data on the Company, including press reports, published financial services, Company applications to the ICC, applications and filings with the SEC, annual reports from prior years, information from Goldman, Sachs' Research Department and other broker-dealers, lists of the Company's banks and lines of available credit and information obtained from contacts with Penn Central management by people at Goldman, Sachs. (481–82) On the basis of Vogel's review, he and Wilson agreed that Penn Central had ample resources to pay its debts and Goldman, Sachs agreed to act as the exclusive dealer in the Company's paper, which became available on August 1, 1968. The following March, the ICC approved Penn Central's request to sell another $50 million of paper for a period through September, 1969.

By the Fall of 1969 both Penn Central and Goldman, Sachs were experiencing certain problems which created a faint tension in their generally amicable business relationship. It was a period of rising interest rates and access to credit was increasingly difficult. This created problems for the management of Penn Central, whose task it was to raise money to finance the deficits which the Company continued to experience at a time when many of its assets were already heavily encumbered. After an encouraging record in 1968, the first two quarters of 1969 showed marked reversals.[6] The Company's cash position was tight, it had a deficit working capital position and its losses were increasing.

In mid-September 1969, Wilson and Vogel met with John O'Herron, Penn Central's new Vice President for Finance, and several other Company officials. The meeting was held at Wilson's request after learning of

---

6. The first quarter figures showed a 66% decline in consolidated earnings from the equivalent period of the previous year; for the first quarter of 1968 consolidated earnings were $13.4 million (58 cents a share), and for the first quarter of 1969, consolidated earnings were $4.6 million (19 cents a share). First quarter results for the parent railroad company showed a net loss of $12.8 million, as compared with a profit of $1.0 million for the similar period of the previous year.

The second quarter consolidated earnings were $21.9 million (91 cents a share), down 7.5% from $23.6 million ($1.03 a share) the previous year. The parent railroad company showed a net loss of $8.2 million, compared with 1968 second quarter earnings of $2.0 million. For the first half year, consolidated earnings declined from $37.0 million in 1968 to $26.5 million in 1969, and the net income of the parent railroad company declined from earnings of $3.0 million in 1968 to a loss of $21.0 million in 1969.

the Company's decision to seek ICC approval to continue to keep out the additional $50 million commercial paper and to authorize a second $50 million increase as well, a decision apparently motivated by the increased demand for cash. Before agreeing that such an increase was wise Wilson wished to review the Company's financial position and plans with O'Herron to satisfy himself that the added float of paper would not be an overextension of the Company's resources.

Among the topics of discussion was bank line coverage of the Company's paper. At the time, the Company had $100 million of bank lines, that is, open lines of credit available to meet maturities of commercial paper in the event that new sales were inadequate to do so, to cover its $150 million of commercial paper outstanding. O'Herron announced his intention to continue his coverage at the $100 million level after the outstandings increased to $200 million. Wilson suggested that investors were looking at bank line coverage as a guide to purchasing decisions and inquired whether O'Herron could increase the coverage by $50 million. O'Herron responded that he could, but because of the expense involved [7] he preferred not to, and he argued that there was no reason to require such an increase in view of the Company's other sources of available cash should it ever be required. Wilson accepted the response, agreeing for the time that in terms of safety there was no need to increase the lines, but stating that he would report back to the Company on any market resistance which might be caused by the 50% line coverage. O'Herron added that the Company's cash position through the 1st quarter of 1970 would be very tight and asked Goldman, Sachs to keep out as much paper as possible until April or longer. (858–63) (Plaintiff's Exhibit 20; Plaintiff's Exhibit 35)

The problem which was developing for Goldman, Sachs in the Fall and Winter of 1969–70, stemmed from its traditional mode of doing business. Historically it had always operated its commercial paper business on an "inventory" basis, purchasing whatever amount of notes an issuer-customer wished to sell in a given period, reselling them as a principal and retaining the unsold excess in its own inventory. (275) The practice provided Goldman, Sachs with a stock of paper of varying maturities and interest rates available for immediate delivery and additionally provided an important banking or underwriting service to issuers, assuring them of a desired level of outstandings and advancing them cash on the unsold notes. (275; Defendant's Trial Memorandum 21–22)

As interest rates steadily increased, however, the cost of doing business in this fashion became a serious concern to Wilson and his colleagues in the commercial paper department. Investors were able to bargain for precisely the maturity dates they desired and for better rates of interest, and the inventory of pre-set notes often went unsold in favor of notes sold on a "special order" and "tap issue" basis.[8] In order to sell notes which accumulated in inventory, Goldman, Sachs often found it necessary to lower the price, i. e., to increase the rate of return, often selling at a lower figure than it initially paid the issuer. This practice is called "distress selling." (276–77; 304) In addition to the problem of distress sales, the defendant also experienced what it termed a "negative carry" cost on the inventory, which refers to the difference between the rate of interest Goldman, Sachs was forced

7. In order to obtain open lines of credit a company is required to have compensatory balances of from 10 to 20% of the line on deposit with the bank. (246–47; Defendant's Exhibit CL; O'Herron Deposition, May 8, 1973, 7–9) The arrangement ties up the money and precludes realization of interest which might otherwise be earned, thus entailing significant costs.

8. In special order and tap issue sales the purchaser specifies his exact requirements and Goldman, Sachs communicates this information to the issuer. The issuer then writes a note tailored to the buyer's demand and delivers it to Goldman, Sachs, which in turn delivers it to the investor on the same day. (254–55) Even in these sales Goldman, Sachs purchases the notes from the issuer and resells them as a principal.

to pay to finance the inventory and the often lower rate of interest it received on the notes themselves. (276; 687–89) As a result of these expenses, the management committee of Goldman, Sachs imposed a limit of $250 million on the total amount of paper the commercial paper department was allowed to inventory at any one time. (690–91) This, in turn, created a constant pressure on Wilson to reduce the inventory of issuers with large inventory positions. (881)

Penn Central was one of the issuers which frequently was high on Goldman, Sachs' inventory list. (See Defendant's Exhibit CW) Throughout the Fall, Wilson continued to encourage the Company to increase its bank line coverage in an effort to enhance the saleability of the notes, and the Company continued to resist the suggestion. O'Herron's feeling was that 50% coverage was perfectly adequate and normal, that increased lines would be too expensive and that in view of the heavily financed condition of the Company he preferred not to ask the banks for additional credit at that time. He desired instead to raise money through the Company's highly profitable non-railroad subsidiary, the Pennsylvania Company, (Pennco), until long-term financing could be arranged. (O'Herron Deposition, May, 1973, 48) (And see 443; 894)

On October 20th, Penn Central's third-quarter earnings were announced, and they reflected a continued deterioration. For the first time the Company reported a consolidated loss, which was $8.9 million (as compared to earnings of $15.2 million for the third-quarter of 1968), and the parent railroad lost $19.2 million (compared to a $3.8 million loss for the same period in the previous year). Consolidated earnings for the first nine months were $17.6 million, down from $52.2 million, and the railroad showed a loss for the year so far of $40.2 million, against a 1968 nine month loss of only $747,000. These figures were widely reported in the financial press. Two days later, O'Herron spoke to Wilson on the phone and assured him that the fourth quarter figures would be " 'in the black' with good improvement," saying that the ICC was expected to approve the additional $50 million in commercial paper imminently. (Plaintiff's Exhibit 33) Authorization finally was granted in early November,[9] and by December 1, the Company had obtained $200 million in "outstandings." ($21.85 million of which was in Goldman, Sachs' inventory!) (Defendant's Exhibit CW at 21) Throughout this month Wilson pressed O'Herron to increase the bank lines, informing him of market resistance to the notes in view of the continued negative financial news.[10]

By December, Goldman, Sachs introduced a new element into the discussions. Alarmed at the size of its Penn Central inventory Wilson suggested to O'Herron that at least $15 million of the back up lines should be converted to demand or "swing

9. In approving the increase the I.C.C. cautioned that:

"Applicant feels that long-term financing the the present time is not feasible due to the tight money situation. Although we are sympathetic to applicant's problem, short-term financing has traditionally been relied upon to finance short-term needs and is not normally regarded as a proper source for long-term financing of capital expenditures or for refinancing of maturing long-term debt. As of June 30, 1969, applicant had a deficit working capital situation which can be expected to worsen if reliance on short-term financing is increased. The exhaustion of short-term credit to refinance maturing long-term debt or to finance long-term capital expenditures could expose a carrier to a serious crisis in the event of an economic squeeze, at which time a carrier may require short-term financing for traditional use. We are, therefore, concerned about the use of short-term financing for long-term purposes and feel that where necessary it should be resorted to cautiously.

On the whole applicant is in a strong financial condition and in view of the present tight money market and applicant's stated intent to negotiate long-term financing as soon as it is feasible, we conclude that the application should be approved. . . ." 336 I.C.C. 1, 4 (October 29, 1969) (Plaintiff's Exhibit 64)

10. In November the papers carried reports of the testimony of Penn Central's counsel before agency hearings in Washington to the effect that the merged railroad was having serious difficulties, as well as reports that the Company had eliminated its fourth quarter dividend.

lines." These are bank lines available to the Company on short notice to cover its cash needs in lieu of unsold commercial paper. (323–32) Such lines would provide an alternative way to meet the Company's cash requirements above the amount of paper it was able to sell and would relieve pressure on Goldman, Sachs to fill this function by taking unsold paper into its inventory. At a meeting on December 9th, representatives from Goldman, Sachs made clear their concern over the size of the inventory, suggested again that the conversion to swing lines be effected and reiterated to Penn Central that there were buyers who looked for 100% bank line coverage. Although Goldman, Sachs continued to agree that this was not necessary from the point of view of safety, or creditworthiness, Wilson felt that it would substantially enhance the marketability of the Penn Central paper. (Plaintiff's Exhibit 22) The Company persisted in its resistance to the added expense of increased bank lines. It did agree, however, that Goldman, Sachs was bearing an unfair burden in maintaining such substantial inventories, and on December 24, 1969 the Company bought back from Goldman, Sachs $16 million of its paper, reducing Goldman, Sachs' inventory to almost nothing. The Company used part of the proceeds from a $50 million Pennco debenture offering to effectuate this repurchase.

Despite this temporary relief, the defendant's inventory of Penn Central notes began to climb again, when, in early January, 1970, at the Company's request Goldman, Sachs agreed to return to their prior arrangement, with the defendant buying as much paper as the Company asked it to and stocking the unsold portion in its inventory. (310–11) By mid-January Penn Central inventory was again in the $12–15 million range. (Defendant's Exhibit CW at 24)

Such was the state of events when, on February 4, 1970, the Company announced its fourth quarter and preliminary year end earnings. Contrary to O'Herron's prediction, the fourth quarter figures showed a $13.2 million consolidated loss. For the entire year the Company earned only $4.4 million, compared to $87 million in 1968, and the railroad lost $56 million, ten times more than it lost the previous year. (Defendant's Exhibit A, 182)

Reaction at Goldman, Sachs was immediate. On the evening of the 4th, Wilson, who was surprised and unsettled by the announcement (988), telephoned the firm's senior partner, Gustave Levy, who was in St. Louis on business, and told him the bad news. Levy, who was the firm's contact with the top echelons of Penn Central, agreed to set up a meeting with David Bevan, the Company's Executive Vice President and chief financial officer, and O'Herron to discuss the significance of the latest figures. The meeting was arranged for February 6th.

In the meantime, on the 5th, Wilson and O'Herron discussed the situation by phone. O'Herron did his best to smooth over the latest figures, set out his anticipation of the Company's cash needs for the coming year, and reported on their plans to obtain long-term financing to begin to solidify the Company's condition. Wilson expressed irritation that he had not been given advance notice of the news, "as we are going to need a story to tell existing holders . . . and new purchasers." (Plaintiff's Exhibit 11) He warned of a large run off of the paper in the wake of the announcement, reiterated his suggestion to get 100% bank lines and intimated that although Goldman, Sachs would be willing to continue selling the paper, it might decide to do so only on a "tap issue," or non-inventory basis. In addition, at Wilson's request, O'Herron agreed to buy back $10 million worth of Goldman, Sachs' inventory on the following Monday, February 9th. (See Plaintiff's Exhibit 11)

It was also on the 5th that Goldman, Sachs began to get indications of adverse investor reaction to the news. Through one of its salesmen it learned that Brown Brothers, Harriman & Co., a banking institution which had in the past purchased up to 15% of outstanding Penn Central paper, had removed the Company from its approved list. Moreover, Jack Vogel received

a telephone call from Alan Rogers, the Senior Analyst at NCO, inquiring about Goldman, Sachs' reaction to the February 4th announcement. Vogel wrote a brief memorandum, or blue sheet,[11] on the conversation with Rogers, as follows:

"Alan Rogers of NCO called me today to express concern over the sharply reduced earnings announced in the newspapers today. He asked if we were continuing to sell the Company's notes and whether I felt that Penn Central had sufficient resources which could be converted to cash to pay down debt, if necessary. I said that Goldman, Sachs was continuing to sell the commercial paper notes of Penn Central Transportation Company. In answer to question number 2, I suggested that the Company has a number of valuable properties and securities, and that I was certain that something could be worked out should it ever become necessary.

Alan said that as a result of my comments, he would continue to carry Penn Central Transportation Company as a prime name."

On February 6th, Wilson and Levy met with Bevan, O'Herron, and Robert Loder, the Company's Treasurer and discussed the recently reported losses, the Company's plans to reverse the trend in the year ahead and the commercial paper situation. Levy and Wilson were satisfied with the explanation of the unexpected 4th quarter losses, which was that the accountants had at the last minute recommended extra charges of $16 million for snow removal and self-insured equipment. (Plaintiff's Exhibit 12) Moreover, they remained convinced that the Company was essentially sound and had the capacity to regain its financial footing. They were impressed by Bevan and O'Herron's plans to meet the Company's anticipated cash needs for 1970 and to obtain long-term financing within the coming months.[12] With regard to the commercial paper, they again raised the question of 100% line coverage, expressed the view that there would be a runoff of $50–$100 million and encouraged the Company to convert $50 million of their existing lines to swing lines to cover the consequent cash shortages. They also announced that they intended to impose a $5 million limit on the amount of Penn Central paper they would inventory at any one time.

On February 9th the Company repurchased $10 million of paper from Goldman, Sachs' inventory and from that point on the inventory rarely exceeded the $5 million limit imposed at the February 6th meeting. (See Defendant's Exhibit CW at 26–30)

On March 13th, University Hill purchased two Penn Central notes in the transaction described above.

### D. The On-going Credit Investigation

Substantial evidence was adduced at trial as to the nature and scope of Goldman, Sachs' credit investigation, conducted primarily by Vogel and Wilson, both prior to the issuance of Penn Central paper and throughout the period that the paper was sold. The staff of the credit department routinely collected all newly available information about the Company as it was released and kept it in the Company's credit file. (Defendant's Exhibit A) This thick file folder contains a range of documents such as annual reports, prospectuses, proxy statements, press releases, newspaper clippings and clippings from Moody's Transportation Manual, a service which provides detailed financial summaries on companies in the transportation field. From his conduct of the initial credit investigation, see 887 *supra*, Vogel was familiar with the

---

11. Blue sheets are internal Goldman, Sachs memoranda which contain reports of all personal or telephonic contacts with issuers. (263–64)

12. Including an anticipated $56 million loss, the Company estimated its 1970 cash need to be $226 million. As of February 6th, $150 million remained to be financed. Bevan and O'Herron stated that they planned a $100 million bond offering in the Penn Central Company as soon as possible and a second $50–100 million long-term financing through a subsidiary at some unspecified time later in the year. (902–905; Plaintiff's Exhibit 12)

Company's financial structure, its resources and obligations, and he maintained familiarity by reviewing the new additions to the credit file as they came in. (505) Although he sometimes performed written calculations to figure the impact of newly developed data on the company's creditworthiness, he often relied on rough approximations done in his head, and what notes he did make were thrown away. (505–06; 558–59) Accordingly, the credit file is barren of any systematic written analysis of the Company's condition from a point if view of creditworthiness. His testimony is that all his calculations were directed toward a determination of the Company's usable assets in excess of debt which were available, if need be, to raise cash to meet its obligations. At all times, according to Vogel, the value of such assets substantially exceeded the amount of outstanding commercial paper, providing what the defendant terms a credit "cushion." (See Appendix A, Defendant's Post-Trial Memorandum)

With Vogel's knowledge of the Company's condition as a fundamental base of information, Vogel and Wilson's on-going credit analysis relied largely on the frequent contacts with management by Wilson and other Goldman, Sachs personnel and on contact with other members of the financial community who had dealings with the Company. In this manner they were able to stay informed as to both management's assessment of and plans for dealing with the Company's problems and the financial community's assessment of and willingness to extend credit to the Company despite its problems. Throughout the period with which this suit is concerned Goldman, Sachs had a high regard for the men in charge of the Penn Central (748–53; 853–54), and found their explanations of the Company's difficulties and their plans to resolve them to be credible and feasible. (See, e.g., note 12, *supra*) Their opinion of management was shared by many (748–53; Sullivan testimony, *F.S.B. v. Levy*, 874–75) and, indeed, many banking institutions continued to extend credit to the company. (See, e.g., 547–48; Plaintiff's Exhibit 23)

The conclusion Wilson drew from these contacts with management and other bankers and from Vogel's continuing determination that the Company's available assets greatly exceeded the amount of outstanding commercial paper was that Penn Central was at all relevant times creditworthy. It is important to note, however, that this conclusion was based entirely on the unchallenged representations of Company management and on data provided to the public by the Company. At no time did Goldman, Sachs ask Bevan or O'Herron to demonstrate a factual basis for their statements and predictions regarding the Company's condition. (895–99)

## II.

### A. The § 12(2) Claim

For the Foundation to recover under § 12(2) of the Securities Act, it must establish that Goldman, Sachs made a false or misleading statement of material fact or omitted to state a material fact "necessary in order to make the statements, in the light of the circumstances under which they were made not misleading," that the Foundation did not know of the untruth or omission and that Goldman, Sachs knew, or in the exercise of reasonable care could have known, of the untruth or omission.[13] *Johns*

---

13. Section 12 of the Securities Act of 1933, provides that:

"Any person who—

\* \* \* \* \* \*

(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him." 15 U.S.C. § 77*l* (1971).

*Hopkins University v. Hutton*, 422 F.2d 1124, 1128 (4th Cir. 1970). As distinct from a claim under Rule 10b–5, under § 12(2) the Foundation need prove neither *scienter* nor reliance, *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 689 (5th Cir. 1971); *Johns Hopkins University v. Hutton, supra*, 422 F.2d at 1129, but some causal relationship between the challenged communication and the sale must be shown. *Jackson v. Oppenheim*, 533 F.2d 826, 829–30 n. 8 (2d Cir. April 5, 1976).

■ Although no express statements or representations were made to LeMay, (with the possible exception, noted below, that the paper was NCO "Prime"), both parties agree that in the context of this transaction there was some implicit representation as to the viability of the Penn Central notes. They disagree, however, precisely what the representation was.[14] We find that Goldman, Sachs impliedly represented that in its opinion, Penn Central was creditworthy. It represented also that there was a reasonable basis for this opinion, i.e., that a reasonable credit investigation had been conducted. See note 14, *supra*. We further find that, in the circumstances of this transaction, Goldman, Sachs represented the paper to be rated "Prime" by NCO. The evidence is unclear whether LeMay expressly requested that he only be shown "Prime" paper on the date of the sale, but we credit his testimony and that of at least one of the

Goldman, Sachs salesmen, that it was generally understood that LeMay was only interested in "Prime" paper unless otherwise stated. (5–8; Coleman Deposition, 112–14; and see Frederickson Deposition 91–92)

The primary issue in the case is whether these three statements were false or misleading.

1. *The Representation that Goldman, Sachs Believed Penn Central to be Creditworthy*

a. *The Alleged Falsity of the Claim*

■ A focus of attention in determining the truth or falsity of Goldman, Sachs' professed belief in the Company's creditworthiness is the $10 million buy-back arranged upon the February 4th announcement of the year-end financial report and consummated only five days later. The Foundation urges that this transaction is explicable only as a reflection that the defendant had lost confidence in the paper and was attempting to lighten its exposure in the event of disaster. We find, however, that the resale of the paper was not the result of such sinister machinations, but rather of honest business considerations and, further, that Goldman, Sachs did in good faith believe that the Company was creditworthy at the time of the sale here in issue.

Wilson and his colleagues in the commercial paper department were genuinely con-

---

Goldman, Sachs concedes the requisite use of interstate commerce in effectuating the sale to the Foundation. Regarding the limitation of the statute to statements made orally or in a prospectus, see note 19, *infra*.

14. The Foundation argues principally that there were two representations: 1) that Penn Central was creditworthy, and 2) that a reasonable credit investigation had been made. Goldman, Sachs maintains that there was only one representation, that it reasonably believed Penn Central to be creditworthy. The difference is largely one of semantics. The defendant's reference to "reasonable belief" interjects the issue of the reasonableness of the credit investigation, as it necessarily includes the concept that Goldman, Sachs had a reasonable basis for its opinion. This, in turn, carries with it the implication that a reasonable credit investigation was made. *Hanley v. Securities and Exchange Commission*, 415 F.2d 589, 597 (2d Cir.

1969). Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, 57 Cornell L.Rev. 869, 890 (July, 1972). (Hereinafter, Jacobs) Throughout this litigation Goldman, Sachs has in effect conceded that it holds itself out as having made a reasonable investigation with regard to all commercial paper that it sells. (See, e.g., Weinberg Deposition, 41).

With regard to the first representation, the only distinction of any significance between the two formulations is whether the statement of Penn Central's creditworthiness was one of fact or of opinion. We agree with the defendant that its sale of the notes can fairly be said to imply only a good faith opinion that the Company was creditworthy. To imply the factual statement that the Company is creditworthy, and to allow the Foundation to prevail by proving the falsity of the statement would border on making Goldman, Sachs an insurer of its issuers' soundness.

cerned throughout this period about the size and cost to Goldman, Sachs of carrying inventory and were making efforts to persuade issuers to obtain swing lines so that inventory could be reduced. Penn Central was not the only object of this campaign (313–15; Defendant's Exhibit BM), (although it may have been the only issuer which was explicitly informed of an inventory limit), and, contrary to the Foundation's assertion, several other issuers with consistently high inventories,—such as the Dow Chemical Company and AVCO Corporation—also repurchased substantial amounts of paper during the same period at Goldman, Sachs' request. (922–23; Defendant's Exhibits FL–FN)

Penn Central was a natural target for these efforts due to the size of the Goldman, Sachs inventories of Penn Central paper and the difficulties encountered in selling the paper. For months the Company had been resisting Goldman, Sachs' suggestions how to improve marketability but demonstrated no exceptional concern for the financial disadvantages of their relationship to Goldman, Sachs. The single buy-back on December 24th (obviously prior to the February 4th announcement) was, from Goldman, Sachs' point of view, a step in the right direction, but it was done without establishing an inventory limit, and the pressures of their relationship proved to be such that without a more-or-less formal understanding Goldman, Sachs again felt obliged in early January, 1970 to accommodate the Company's urgent need for cash.

The February buy-back and inventory limit represented a statement by Goldman, Sachs that although it was still willing to try to sell the paper, it was no longer willing to inventory it at considerable cost in the interest of accommodating a customer so unresponsive to its business advice. The February 4th announcement gave Wilson an opportunity to step up the pressure and he took it, at once reducing inventory, establishing a rough limit and pressuring the Company to reduce its dependance on the inventory method. The fact that he did so, however, is not inconsistent with his testimony that he never doubted the creditworthiness of the Company. To conclude otherwise would be to propose that simply because he genuinely believed that Penn Central would weather the storm he should have been willing to continue to bear the extra costs entailed in holding such an unusually large inventory, costs which he believed should properly be borne by the Company. That he later told O'Herron that the inventory limit would stand "until such time as they obtained 100% line coverage, completed some of these long-term financings, and started to reduce the operating losses" (Plaintiff's Exhibit 14) is, contrary to the Foundation's assertion, fully consistent with this interpretation of Wilson's behavior. As a salesman, his concern was for the marketability of his product, and he didn't plan to stock large quantities until convinced that it would sell well. His remark that he would "need a story to tell investors" was a sharp but casual rebuke to O'Herron for not having given him advance notice of the bad news, not the cynical comment of a conspirator against the investing public.

We find that based upon their perception of the Company's difficulties and its plans and capacity to deal with them, the men in charge at Goldman, Sachs did in good faith believe that the Company was creditworthy. We are not satisfied that there is reason to disbelieve the emphatic testimony on this point by Wilson, Vogel and Levy. One important matter which deserves particular mention in this regard is the testimony of Gustave Levy, Senior Partner of the firm, that as sole discretionary trustee in the "blind trust" of Walter Annenberg, then United States Ambassador to the Court of St. James and a close personal friend, Levy refrained, in or about November, 1969, from selling a substantial block of the Trust's Penn Central stock because of his view that it was underpriced. This decision was made at the very time when Levy was liquidating all other equity securities in the portfolio, including, for example, the stock of General Motors and Campbell Soup, because he believed that it was generally preferable to invest in debt instru-

ments in view of the condition of the market at that time. When Penn Central filed in bankruptcy, the stock was still held by the trust, causing a loss of several million dollars. (762–66; and see Defendant's Exhibits CB–CE) With due allowance for the different considerations entailed in dealing with commercial paper and equity securities, it is indeed difficult to believe that Levy would have acted as he did had he or his colleagues genuinely doubted the viability of the Company.[15]

### b. The Alleged Omissions

■ The Foundation also contends that the failure to disclose certain discrete facts, e. g., the unsuccessful efforts to convince the Company to increase bank lines, the removal of the notes from the approved list of Brown Brothers, Harriman, the facts of the post-February 4th buy-back, constituted material omissions which, "in light of the circumstances" rendered the statement made misleading or untrue. In considering this claim, one must view it in the context of the special circumstances of the transaction, which relate both to the nature of the commercial paper market as a whole and to LeMay's modus operandi within that market. Proof at trial demonstrated that for reasons relating to economics and practicalities peculiar to commercial paper, sales are made by way of hurried phone calls in which there is little or no expectation of unsolicited disclosure of the numerous facts always available as to an issuer's condition. Moreover, it is plain that whatever course other purchasers may have taken, such as inquiring into bank line coverage, LeMay sought no information whatsoever. Apart from ascertaining that the paper was prime, (with which we deal separately) he sought only a judgment of creditworthiness and chose to rely on it.

In a slightly different but parallel context the court in *Phillips v. Reynolds & Co.,* 297 F.Supp. 736 (E.D.Pa.1969) refused to hold a broker liable for failure to inform the plaintiff of a particular negative fact about the corporation whose stock he sold, where the evidence showed that the plaintiff sought only the broker's investment judgment. The court reasoned that:

"[the buyer] admitted that he was relying on [the defendants'] judgment and opinion. [The defendant] did in fact accurately represent his opinion of [the issuer] . . . [The buyer] never requested any financial information concerning [the issuer], and made his own decision to risk nearly $60,000 after talking with [the defendant] on the telephone.

\* \* \* \* \* \*

"[The buyer] was an experienced businessman who had made significant profits on [the defendant's] advice in the past and who chose to risk significant amounts after hearing a brief discussion on the telephone.

\* \* \* \* \* \*

" 'To make a broker liable under these circumstances would make him a virtual insurer of his investment recommendations unless he provided customers with every conceivable material fact concerning a stock before customers purchased . . .' " *Phillips v. Reynolds & Co.,* 297 F.Supp. at 738, (citing earlier opinion in same case, 294 F.Supp. 1249).

This statement is singularly applicable to the facts at hand.

■ It follows that none of the alleged omissions can be considered necessary "in light of the circumstances" unless the omitted facts, of themselves, rendered a judgment that the Company was creditworthy

15. We are, of course, aware that our determination that Goldman, Sachs acted in the good faith belief that the Company was creditworthy is contrary to the conclusion reached by Judge Metzner in *F.S.B. v. Levy, supra,* D.C., 406 F.Supp. 40 (1975). It is important to note that the record in this case contains substantial and persuasive evidence of the defendant's good faith which was not before the court in the prior action. We refer, in particular, to proof regarding returns of inventory to issuers other than Penn Central, like AVCO and Dow Chemical, and Levy's action as trustee of the Annenberg Trust. See Defendant's Memorandum in Support of Motion Pursuant to Rules 52(b) and 59(a), Federal Rules of Civil Procedure, submitted in *F.S.B. v. Levy, supra.*

unreasonable. For the following reasons we find that this is not true of any of the alleged omissions here.

With regard to the non-disclosure of the $10 million buy-back on February 9th, this conclusion is implicit in our determination that the transaction was motivated by legitimate business considerations and not by a loss of faith in the paper. The non-disclosure of the unsuccessful efforts to see that the Company raised bank line coverage to 100% would be actionable only if this was motivated by doubts as to creditworthiness. We are persuaded, however, that Wilson's campaign to convince O'Herron to obtain more lines was motivated by Wilson's concern for the marketability of the notes. Although this obviously indicates that in the minds of many investors at the time 100% coverage was an important index of creditworthiness, to the analysts at Goldman, Sachs it was far from determinative of this condition, since there were many other factors bearing on the ability and/or the desire of the Company to increase the coverage. (511–16) Similarly, while the facts 1) that Brown Brothers, Harriman removed the notes from its approved list, 2) that the Company was in a tight cash position with increasing losses and 3) that the ICC had expressed concern that the proceeds from the sale of paper were not being used to finance current transactions, are all relevant to a judgment of creditworthiness, none of them singularly or in the aggregate can be said to be necessarily conclusive of the judgment.

### 2. The Representation That the Paper was "Prime"

■ The analysis of the *Phillips* court does not apply to the claims of the Foundation that the defendant failed to disclose that the "Prime" rating was based solely on Goldman, Sachs' decision to continue sales. If the rating service actually abdicated its independent judgment as to the quality of the Penn Central paper, or if Goldman, Sachs was so informed, a failure to qualify the representation that the paper was NCO "Prime" accordingly would clearly consti-

tute a material omission "necessary under the circumstances." The proof at trial fails to establish, however, that NCO's "Prime" rating was based exclusively on Goldman, Sachs' statement that it would continue to sell the paper or that Goldman, Sachs had reason to believe that this was the case.

The evidence in support of the Foundation's contention consists of references in two internal Goldman, Sachs memoranda, by Vogel and Wilson respectively, to Vogel's conversation with Alan Rogers of NCO on February 5th. Vogel's blue sheet of that date, set forth in full above, indicates that Rogers, disturbed by the previous day's negative financial reports, called to obtain Vogel's reaction to the news. Contrary to the Foundation's assertion, the memorandum simply does not indicate that Rogers premised the continued prime rating solely on Goldman, Sachs' determination to continue sales. It states only that, "[A]s a result of my comments [i. e. that Vogel was confident of the Company's ability to meet maturities and that Goldman, Sachs would go on selling the notes] he would continue to carry Penn Central Transportation Company as a prime name." At most, this establishes that, in addition to the defendant's plans to market the notes, Rogers based his rating decision upon Vogel's statement that he continued to believe that the Company was creditworthy because it had sufficient resources to raise money to pay down debt as the need arose.

There is no basis to presume that Rogers' consultation with Vogel represented an abdication of Rogers' responsibility to render an independent judgment of the Company's condition. It was normal for Rogers, a long-time professional acquaintance of Vogel, to call Vogel to exchange views on credit matters, both as to Goldman, Sachs issuers and general market conditions. No inference of irresponsibility can be drawn from the fact that Rogers sought Vogel's opinion of the Company's capacity to pay the notes when due. In fact, it would seem rather irresponsible for the rating service not to touch base with the exclusive dealer in this paper in the course of monitoring the

Company's status and attempting to evaluate the significance of the recent adverse news.

In the absence of additional evidence to support the inference the Foundation would have us draw, we are unwilling to read Rogers' casual remark to his friend Vogel that "as a result of my comments . . . he would continue to carry [the Company] as a prime name" with the literalness which might be accorded to an affidavit. The reasonable interpretation is that, in combination with everything else he knew about the Company, Vogel's continued belief in the Company's viability was sufficient and credible reassurance to Rogers that the paper was entitled to a "Prime" rating. Moreover, even if Rogers had based the decision solely on Vogel's expression of confidence, Goldman, Sachs would not be liable for failing to disclose it unless it knew or should have known that this was the case. There is nothing to indicate that Vogel understood Rogers' remark to convey such a message or that it was unreasonable for him to believe that Rogers' decision was an independent one. As we read Vogel's blue sheet of February 5th, it is not the damning document the Foundation claims it to be. In fact, it is not unreasonable to infer that had LeMay been shown a copy of this memo, he would have viewed it as an added assurance of the safety of the investment.

Wilson's blue sheet on the February 6th luncheon meeting with Levy, Bevan, O'Herron and Loder reports that, in discussing the problems relating to commercial paper, "I also explained Allen Rogers' conversation with Jack Vogel and that Allen's feeling was that as long as Goldman, Sachs was going to continue to handle Penn Central's

c/p he would keep the 'Prime' rating." (Plaintiff's Exhibit 12) In reconciling the differences between Wilson's formulation of Roger's remarks and Vogel's, the latter's is entitled to the greater weight, since he was the direct participant in the conversation and Wilson was not. More importantly, Wilson's choice of words must be viewed in the context of the February 6th meeting. He was speaking to Company officials and trying to impress upon them the importance of accepting his advice about taking steps to improve the marketability of the notes. It was clearly in his best interests to raise the possibility of losing the prime rating if things continued to deteriorate and to suggest that Goldman, Sachs had a particularly strong input into the rating decision.

In sum, the preponderance of the credible evidence does not support the Foundation's claim that the "Prime" rating was based exclusively on the defendant's decision to continue sales or that Goldman, Sachs had reason to believe that this was the case.[16] Accordingly, Goldman, Sachs cannot be held liable for failure to advise LeMay of his conversation with Rogers.

### 3. The Representation That a Reasonable Credit Investigation Had Been Made

In order to determine the truth or falsity of Goldman, Sachs' representation that a reasonable credit investigation had been made it is first necessary to ascertain the standard of reasonableness by which the defendant is to be judged. We have found no cases expressly directed to this issue, but there is a body of law in related contexts from which certain principles may be fairly derived.

---

**16.** NCO's involvement in the rating and marketing of Penn Central notes was the exclusive focus of the trial in *Mallinckrodt Chemical Works v. Goldman, Sachs & Co., et al.,* 420 F.Supp. 231, 71 Civ. 1437 (CHT), another one of the "commercial paper cases," see note 1, *supra,* in which Dun & Bradstreet, the parent organization of NCO, was joined as a defendant. The other defendants in that case settled before trial. In a detailed and persuasive opinion, Judge Tenney recently dismissed the complaint against Dun & Bradstreet, finding, *inter alia,* that the staff of NCO based its rating decision on its own independent analysis, which in part may have considered the fact that Goldman, Sachs continued to sell the paper. Memorandum Opinion, September 13, 1976, at 26–27. Judge Tenney's conclusions, which are based on much more extensive evidence on the point then presented in the record of this case, are consistent with and supportive of our finding above.

### a. The Standard of Reasonableness

As one facet of the so-called "shingle theory"[17] broker-dealers are required to have a reasonable basis for recommendations made to customers which, in turn, imposes an obligation to conduct a reasonable investigation of the security's issuer. *Hanley v. S.E.C.*, 415 F.2d 589, 597 (2d Cir. 1969); *Kahn v. S.E.C.*, 297 F.2d 112 (2d Cir.), *rev'g and remanding MacRobbins & Co., Inc.*, 40 S.E.C. 497 (1961). See generally, Jacobs, *supra*, note 14, at 883–97. The amount and nature of investigation required in this context is flexible, depending on the nature and strength of the recommendation and the role of the broker-dealer in the transaction, *Canizaro v. Kohlmeyer & Co.*, 370 F.Supp. 282, 289 and n. 6 (E.D.La. 1974), quoting Jacobs, *supra*, note 14 at 87, his knowledge of and relation to the issuer, *Levine v. S.E.C.*, 436 F.2d 88, 90 (2d Cir. 1971), and the size and stability of the issuing company. *Hanley v. S.E.C., supra*, 415 F.2d 589, 597. And see Jacobs, *supra*, note 14, at 888. There are thus no iron clad rules as to what a broker must do to meet his responsibility. In *Hanley, supra,* the court stated that:

> "A salesman may not rely blindly upon the issuer for information concerning a company, although the degree of independent investigation which must be made by a securities dealer will vary in each case. Securities issued by smaller companies of recent origin obviously require more thorough investigation." 415 F.2d at 597.

Subsequently, in *Levine v. S.E.C., supra,* 436 F.2d 88, the court indicated that except in unusual circumstances the obligation to investigate does not impose a duty of first hand verification.

"[A]bsent actual knowledge or warning signals, a broker-dealer should not be under a duty to retain his own auditor to re-examine the books of every company, the stock of which he may be offering for sale . . ." 436 F.2d at 90. It reiterated that "each case must be decided on its own specific facts," *id.,* and held in that case that the broker's intimate knowledge and opportunity for knowledge of the issuer's affairs precluded him from relying exclusively on data released by the Company which he could easily have verified. Language in *Hanley,* a case brought under the rubric of Rule 10b–5, suggests that a somewhat greater showing of inadequate investigation and/or culpable mental state may be required in a civil action by a customer seeking damages for losses caused by reliance on the implied warranty than in disciplinary proceedings instituted by the S.E.C. 415 F.2d 596 and n. 13. However the applicability of this suggestion to a claim under § 12(2), a negligence statute, is questionable.

A second relevant group of decisions involve civil suits by aggrieved investors against underwriters for failure to investigate statements made in registration materials filed pursuant to § 5 of the Securities Act, 15 U.S.C. § 77e. The obligation to inquire in these decisions does not derive from so subtle a source as the shingle theory, but rather is rooted in the express statutory language of § 11(b) of the Securities Act, 15 U.S.C. § 77k(b) that only by demonstrating that a "reasonable investigation" was made can an underwriter escape liability for misrepresentations in registration statements. These cases reflect an approach to the evaluation of the reasonableness of an underwriter's investigation similar to that of the broker-dealer cases, *supra.*[18] However, since an underwriter's

---

17. Under this doctrine, when a broker-dealer hangs out his shingle he implicitly represents that he will deal fairly with the public. 3 L. Loss, Securities Regulation 1483 (2d Ed. 1961). See *Charles Hughes & Co., Inc. v. SEC*, 139 F.2d 434 (2d Cir. 1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944); *Brennan v. Midwestern Life Insurance Co.*, 286 F.Supp. 702, 707 (N.D.Ind.1968), *aff'd* 417 F.2d

147 (7th Cir. 1969), *cert. denied* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). See generally, 3 L. Loss, Securities Regulation, *supra,* 1482–93.

18. In *Escott v. BarChris Construction Corp.*, 283 F.Supp. 643 (S.D.N.Y.1968), Judge McLean concluded that the duty of "reasonable investigation" imposed by § 11

relation to the issuer is more substantial than that of a broker-dealer and it plays a more central role in the marketing process, somewhat more is required of an underwriter than a broker-dealer to discharge its obligation to the investing public. In *Feit v. Leasco Data Processing Equipment Corp.,* 332 F.Supp. 544 (E.D.N.Y.1971) Judge Weinstein put it that:

> " . . . The courts must be particularly scrupulous in examining the conduct of underwriters since they are supposed to assume an opposing posture with respect to management. The average investor probably assumes that some issuers will lie, but he probably has somewhat more confidence in the average level of morality of an underwriter who has established a reputation for fair dealing. Judge McLean expressed the proper relationship between underwriters and management in *BarChris:*
>
>> 'In a sense, the positions of the underwriter and the company's officers are adverse. It is not unlikely that statements made by company officers to an underwriter to induce him to underwrite may be self-serving. They may be unduly enthusiastic.' *Escott v. BarChris Construction Corp.,* 283 F.Supp. 643, 696 (S.D.N.Y.1968).
>
> In light of this adverse position they must be expected to be alert to exaggerations and rosy outlooks and chary of all assurances by the issuer. Their duty is to the investing public under Section 11 as well as to their own self-interest and that duty cannot be taken lightly." 332 F.Supp. at 581.

He added, however, in keeping with the tendency in all of these cases to key the degree of inquiry required to the relationship with the issuer, that an underwriter

"cannot, of course, be expected to possess the intimate knowledge of corporate affairs of inside directors, and their duty to investigate should be considered in light of their more limited access." 332 F.2d at 582.

On a similar analysis, although on a showing of culpability somewhat greater than negligence, failure to verify certain representations in a registration filed in regard to a prospective merger sufficed to render an underwriter liable to a competing offer-or under § 14(e) of the Securities Exchange Act. 15 U.S.C. § 78n(e). *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 369–73 (2d Cir. 1973).

The case which is factually closest to the instant controversy is *Sanders v. John Nuveen & Co., Inc.,* 524 F.2d 1064 (7th Cir. 1975), *vacated and remanded,* 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976). In *Sanders* the defendant commercial paper dealer was sued by holders of worthless notes for failure reasonably to investigate the issuer, Winter & Hirsch, Inc. (WH), which had collapsed upon the rather sudden discovery that for ten years the principals of WH and its accounting firm had engaged in a massive fraud and the firm was hopelessly insolvent. In an opinion by then Judge (now Mr. Justice) Stevens, the court affirmed the district court's finding that Nuveen was liable to its customers under Rule 10b–5 because it breached a duty to make reasonable inquiries and such inquiries would have uncovered the fraud. The district court concluded that Nuveen, having bought and sold virtually all of WH's commercial paper, acted as an underwriter of the notes and this finding was not contested on appeal. 524 F.2d 1067. In reliance on the analysis of the underwriter's function and obligation in securities transactions in *Escott, Feit* and *Chris-Craft, su-*

---

"must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of 'data presented' to them by the company. It should make no difference that this data is elicited by questions addressed to the company officer by the underwriters, or that the underwriters at the time believe that the

company's officers are truthful and reliable. In order to make the underwriters' participation in this enterprise of any value to the investors, the underwriters must make some reasonable attempt to verify the data submitted to them. They may not rely solely on the company's officers or on the company's counsel." 283 F.Supp. 697.

*pra,* Judge Stevens held that it was insufficient for Nuveen to have relied on published information about WH without attempting to verify the data. He noted that such reliance would satisfy a broker's duties under *Hanley, supra,* but that "a greater quantity of information is 'reasonably ascertainable' by an underwriter than by a mere broker, and something more than published data must be analyzed if an underwriter is to discharge his duty of investigation." 524 F.2d 1071.

█ The *vacatur* and remand of *Sanders* for reconsideration in light of *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) casts serious doubt on the continued validity of the holding that, absent *scienter,* mere breach of duty to investigate where compliance would have revealed a fraud can give rise to liability under Rule 10b–5. Judge Stevens' discussion of what constitutes reasonable investigation retains relevance to this case, however, where liability is premised on an alleged false representation that the investigation was reasonable under § 12(2), a statute which requires no showing of *scienter.*[19] Moreover, both *Sanders* and *Chris-Craft,* brought under Sections 10(b) and 14 of the '34 Act respectively, refute Goldman, Sachs' assertion that "the status of underwriter has significance in terms of civil liability only under Section 11." (Defendant's Post-Trial Memorandum, p. 122)

█ On the other hand we do agree that there are significant distinctions between the task of investigating or verifying specific factual representations in a particular registration statement or prospectus, which was the focus of the court's attention in *Chris-Craft* and the § 11 cases, and pursuing an on-going, judgmental determination such as "creditworthiness." Accordingly, it would be inappropriate to import wholesale to the commercial paper context the duties imposed under § 11. Nor would it be proper to read Judge Stevens' language in *Sanders* as establishing an inflexible rule that an investigation which fails to include first hand verification of an issuer's financial condition is *per se* unreasonable. Rather, in keeping with the approach of all the "reasonable investigation" cases discussed above, what is required is a close consideration of the facts of the relationship between Penn Central and Goldman, Sachs, the latter's access to information, the nature of the data it relied upon and the presence or absence of "warning signals", *Levine v. S.E.C., supra,* 436 F.2d at 90, to Goldman, Sachs that something more might be in order.

### b. The Reasonableness of Goldman, Sachs' Credit Investigation

█ Based on the role it played in marketing Penn Central notes, Goldman, Sachs' credit investigation must be judged by a fairly rigorous standard. There can be no serious question that in buying virtually all of the paper issued by the company, distributing it to investors and taking the unsold portions into its inventory it functioned as an underwriter both as that term is defined in the Securities Act[20] and as commonly understood in the American financial com-

---

**19.** The trial court in *Sanders* dismissed a § 12(2) claim for reasons which are not entirely clear from the Circuit Court's opinion. See *Sanders, supra,* 524 F.2d at 1069 and n. 11. It appears that the decision was based on a determination that no prospectus was involved in the sale. *Id.* The statute only applies to sales effectuated by false or misleading oral statements or statements made in a prospectus. See note 13, *supra.* The sale in this case was effectuated by means of oral communications between Goldman, Sachs' salesmen and LeMay and those communications embodied the implicit representations alleged to be false. Our research has disclosed no relevant cases, but we perceive no reason why the statute should not apply to such facts. Indeed, the defendant has nowhere suggested that the § 12(2) claim is not properly asserted for this or any other reason.

**20.** Section 2(11) of the Securities Act, in pertinent part, defines an "underwriter" as

"any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security . . ."

15 U.S.C. § 77b(11). See generally, 1 L. Loss, Securities Regulation 547–57 (2d Ed. 1961).

munity.[21] Moreover, it singlehandedly directed the entire distribution campaign and was the exclusive source of the notes for all would-be purchasers. Not only was its relationship to the Penn Central management, therefore, uniquely close, but its implicit warrant of the soundness of its basis for recommending the notes was correspondingly far greater than that of an ordinary broker-dealer. See *Canizaro v. Kohlmeyer & Co., supra,* 370 F.Supp. 282, 289 (E.D.La.1974) ("The brokers' obligation to his customer to investigate . . . must surely increase in direct proportion to the degree of his participation in the sale.")

 With full allowance for Goldman, Sachs' obligations under the circumstances, however, we cannot agree with the Foundation that the entire credit investigation was unreasonable because it was based simply upon publicly available information and the unverified representations of management. As is clear from the foregoing discussion, we do not believe that the law imposes such an arbitrary measure by which a credit investigation may be judged. Moreover, there are important distinctions between relying on unsubstantiated figures or statements provided directly by the Company and relying on certified figures and statements in such documents as annual reports, offering circulars, government filings and industry-wide information services, all of which—individually and even more so in the aggregate—attain cumulative aspects of reliability. It would be unreasonable to require commercial paper dealers to conduct far-reaching, first hand verification of all issuing companies, no matter how strong the indications of financial well-being, and thereby to provide all disappointed purchasers with a cause of action against the dealer for failure to do so. (Our findings below are based solely on the particular facts of this case.) Neither can we agree that the somewhat casual manner in which the credit review was conducted alone warrants a finding of unreasonableness. While the record amply supports the conclusion that the analysis of the Compa-

ny's financial resources was conducted largely inside Vogel's head, and the absence of a single comprehensive written evaluation of the Company's creditworthiness is, to a lawyer certainly, noteworthy, there is no evidence to suggest that such informal procedures in conjunction with regular contacts with management could under no circumstances suffice to keep a dealer adequately informed of an issuer's strength. Goldman, Sachs' credit file on Penn Central contains a substantial collection of relevant data with which Vogel was at least generally familiar, and his sense of the margin by which the value of assets available to raise cash exceeded the amount of outstanding commercial paper, the so-called credit cushion, appears to have been generally accurate.

Nevertheless, the defense asserted by Goldman, Sachs in support of its credit investigation is unacceptable. Throughout the case the defendant has argued that in the conduct of its ongoing credit review it simply never had reason to doubt the Company's viability. When queried by the court as to what kind of information he could have received which would have alerted him to the impending debacle, Wilson responded essentially that he could think of none because the Company had ample resources to raise cash up to the very end and management at all times spoke credibly and reassuringly of their options for reversing the downward trend. (937–38) In fact, defense witnesses maintained that Penn Central's collapse was a financially unnecessary event, caused by a failure of will or imagination on the part of management upon the government's unexpected refusal to extend a loan to the Company to cover for the last-minute withdrawal of a large debenture offering. (See 759–60) Necessarily implicit in this line of defense is the breathtaking proposition that so far as Goldman, Sachs could reasonably ascertain, the Company was actually creditworthy up to the bitter end. The argument proves too much. While our findings in no sense depend upon it, one may nevertheless fairly

---

21. See generally, 1 L. Loss, Securities Regulation, *supra,* 163–64.

ask whether the defendant's procedures and standards for monitoring the creditworthiness of an issuer might not almost be said to be *prima facie* inadequate if it is possible that such a presumably sound company as Penn Central could go bankrupt without the prior knowledge of, or even without a hint to Goldman, Sachs, its exclusive dealer in commercial paper.

The question, however, is not whether Goldman, Sachs conducted a reasonable credit investigation in May or June, 1970, but whether by March 13, 1970, the date of the Foundation's purchase, there were sufficient storm warnings as to the Company's insecure condition to render Goldman, Sachs' normal procedures inadequate and to require more concrete verification of management representations and projections. We conclude that such cause existed at least upon the disclosure of the 1969 fourth quarter and year end figures in early February, 1970. At that point there were surely enough signs that the Company was in serious financial straits to render the defendant's exclusive reliance on publicly available data and the unverified representations of management inadequate to meet its obligation to the investing public. Its failure to inquire more closely into the basis for the statements of Bevan and O'Herron at the February 6th meeting, to require access to Company records and projections, to verify them or more aggressively to consult with other financial institutions which dealt with the Company for their appraisal of the Company's position, rendered Goldman, Sachs' ongoing credit investigation unreasonable, and its representation to the Foundation untrue within the meaning of § 12(2).

Consideration of the reasonableness of Goldman, Sachs' response to the February 4th announcement begins with the fact that Penn Central was from the start an atypical issuing company which faced particularly adverse circumstances throughout the Fall and Winter of 1969–70. Vogel, himself, recognized that Penn Central, being the product of a merger of two financially bedeviled - railroads, was a "very unique credit." (556–57) [22] The Company's entire commercial paper program was motivated in large part by the need to raise cash to finance long-term expenditures and refinance long-term debt. This untraditional use of short-term financing was required because substantial earnings were not anticipated in the first several years of the Company's existence while economies were to be achieved. In approving the final increase in commercial paper from $150 to $200 million, the ICC, in October, 1969 expressed concern about this unusual use of commercial paper and warned that the tactic "could expose [the Company] to a serious crisis in the event of an economic squeeze." (see note 9, *supra*) It was understood that the Company's future depended heavily on its ability to obtain long-term financing in the fairly near future, see *id.*, which made the existence of thorough, realistic plans for such financing an absolute necessity. Successful financing, in turn, depended in large part on public confidence in the prospect of successful operations—or at least future operations—giving added gravity to negative financial news which received wide publicity throughout this period. See, e. g., note 10, *supra*. It thus seems clear that there was particular reason for Goldman, Sachs to be concerned about unanticipated adverse developments in the Company's financial posture. Despite its undoubted capacity on paper to absorb large losses, there was a point at which public confidence might be so shattered that the vital refinancing could not be accomplished. Wilson himself persistently voiced his fear of a runoff in the commercial paper outstandings due to a loss of investor interest in the notes as the bad news mounted. And the generally negative market conditions which prevailed for long-term as well as short-term financing dictated even greater cau-

---

**22.** Indeed, it was the absence of a track record of earnings and performance and the expectation that it would be several years before significant earnings would be realized which ne-cessitated his focus on the Company's saleable or pledgeable assets to determine its creditworthiness. (Tr. 477–78; 556–57).

tion as to the Company's optimistic plans for refinancing. (See, e. g., Defendant's Exhibit FJ).

Goldman, Sachs' repeated claim that throughout this period of financial hardship it had no reason to doubt the dependability and candor of Company management in their dealings with each other is not supported by the record. It was well understood at Goldman, Sachs that the Company was under particular strain. It was also clear to Wilson that due in large part to the strain an adversary element had entered into their relationship, as a result of which management was not being entirely forthcoming in regard to its ability to obtain additional bank line coverage. In fact, the relations between the two firms during this period as described by Goldman, Sachs' own witnesses was one which alone renders its uncritical acceptance of Company representations open to question. The lack of candor was not limited to the sparring over bank lines, moreover. According to Wilson's blue sheet of October 22, 1969, O'Herron indicated to him in a phone conversation that the Company would "show a small loss in the 3rd quarter, but anticipate[d] the 4th quarter will be 'in the black' with a good improvement." (Plaintiff's Exhibit 33) In fact, the 3rd quarter figures, which had actually been released the previous day, reflected a loss for the Company on a consolidated basis of $8.9 million and a loss for the parent railroad of $19.2 million. This was the Company's first consolidated loss and the largest reported loss for the parent railroad to date, see note 6, *supra*, bringing its loss for the year to a total of $40.2 million. O'Herron's characterization of these figures as a "small loss" appears at best to have been disingenuous. His assurances that the 4th quarter would be in the black, concededly a more speculative proposition, again proved to be way off the mark. The consolidated loss for this period was $13.2 million, and for the railroad alone $16 million, bringing the year-end total to $56 million. Moreover, to Wilson's irritation, O'Herron did not even see fit to give him any advance notice of the negative report despite its marked divergence from O'Herron's earlier prediction.

Wilson and Levy were chargeable not only with knowledge of these facts when they set out for the February 6th luncheon meeting with Bevan, O'Herron and Loder, but also with knowledge that indications of serious adverse investor reaction had already developed. We have dealt at length above with Alan Rogers' call to Vogel to "express concern" over the latest reports. Although it is of course true that Vogel satisfied Rogers that the Company remained creditworthy, the very fact that the call was made nevertheless was an indication, if any was needed, that the news could cause severe negative reaction among investors. More important, Goldman, Sachs also knew that Brown Brothers, Harriman, a highly respected banking institution which had in the past held up to 15% of Penn Central's outstanding commercial paper, had removed the Company from its approved list.

All of these factors combine to render the defendant's uncritical acceptance of Bevan's forecasts and projections at the February 6th luncheon meeting and the complete absence of any effort to confirm that there was some factual basis for them a failure of reasonable ongoing credit investigation. Bearing in mind the Company's fundamental dependence on sales of commercial paper, the power struggle which had developed over the means of marketing the notes, the lack of candor on the part of management in previous months and the negative financial developments throughout the same period, the description of the issuer-underwriter relationship in *Escott v. BarChris Constr. Corp., supra,* note 17, has a singularly poignant ring:

> "It is not unlikely that statements made by company officers to an underwriter to induce him to underwrite may be self-serving. They may be unduly enthusiastic." 283 F.Supp. at 696–97.

In fact, Bevan predicted that railroad losses for the year 1970 would again be $56 million, i. e., that the situation had bottomed. In April, however, the Company

reported a gargantuan $62.7 million railroad loss for the first quarter alone, and a consolidated loss of $17.2 million, a development which signalled the beginning of the end. Had the defendant requested copies of the Company's projected first quarter earnings as they were revised on a bi-weekly basis it would have seen that from mid-February through early March the enormity of the 1st quarter results was foreseen. (Plaintiff's Exhibit 101–03) Similarly, if defense witnesses are correct that the bankruptcy was triggered by a lack of adequate contingency planning, inquiry would have revealed the situation. What is perhaps most striking, in light of the continuous series of reported railroad losses in the previous year, is the total absence of inquiry into railroad operations, which were at once the Achilles' heel and the *sine qua non* of success. There is no reason to doubt that the Company would have provided this kind of information to Goldman, Sachs at this juncture in view of its dependence on the commercial paper market, and in turn, on Goldman, Sachs, for survival until long-term financing could be arranged. Moreover, the record is plain that Goldman, Sachs had easy access to the opinions of other members of the financial community, so that it could readily have inquired of Brown Brothers, Harriman as to the reasons it had removed the Company from its approved list. (831) Had it made anything more than a superficial inquiry into the circumstances surrounding a $50 million bridge loan obtained through Pennco at the end of February, it could probably also have learned that the First National City Bank, the Company's single largest lender, had declined to participate in the loan because of reservations about the continued heavy use of the relatively profitable subsidiary to channel money to the ailing railroad. (See Sullivan Testimony *F. S. B. v. Levy,* 889–90; 898–903; and see Plaintiff's Exhibit 106; Defendant's Exhibit AD; Defendant's Exhibit A–84) The main point, however, is not what Goldman, Sachs would have learned but what it should have done to discharge its duty reasonably to inquire and to render its representation that it did so investigate true.[23]

Although we credit Goldman, Sachs' assertion that it acted at all times in the good faith belief that the Company was creditworthy, by early February, 1970 it had reason to be far more cautious and inquisitive than it was. By that time there were enough danger signals that an aggressive skepticism was in order regarding the cheery predictions and projections of management. As the underwriter and exclusive dealer in these securities Goldman, Sachs had important obligations to the investing public to put Company management to the test and make them demonstrate a realistic basis for their optimism. It lost sight of these responsibilities, however. Perhaps more accurately it was unduly confident that an entity with the size and resources of Penn Central, like the Titanic, could not go under. Indeed, one comes away from this case with the ironic impression that the analysts at Goldman, Sachs and many of their colleagues in the financial community made the same fatal assumption made by Fitzpatrick, who instinctively felt that an investment in a company as large as the Penn Central was as safe as the United States Government.

 The remaining elements of § 12(2) liability may be treated briefly.

---

**23.** If Goldman, Sachs' credit investigation had been reasonable it would not be liable to the Foundation even if it remained convinced that the Company was creditworthy, unless what it learned was sufficient to render an opinion of creditworthiness itself unreasonable. Since it is uncertain precisely what information a reasonable investigation would have revealed, it is impossible to state whether Goldman, Sachs would have been liable under the latter theory had it adequately inquired and yet continued to market the paper. In view of the enormity of the continuing 1st quarter losses and the increasingly bleak market conditions for long-term financing (see Defendant's Exhibit FJ), however, a court might well conclude that a continued belief in the creditworthiness of the Company would have been unreasonable. Despite the defendant's efforts to minimize the significance of the huge losses, there is at least some testimony that they were indeed a significant cause of the Company's demise. (813).

The materiality of the false representation that a reasonable credit investigation had been conducted, i. e., that a reasonable commercial paper investor would attach importance to the representation in making his investment decision, *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1302 (2d Cir. 1973); *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), or that there is a "substantial likelihood" that such is the case, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), is apparent from the reliance so many investors placed on the identity of the dealer of a particular issue. The materiality of this representation is not contested by the defendant. It is also plain that the Foundation did not know of the untruth, and that it was causally related to the sale. See *Jackson v. Oppenheim, supra,* 533 F.2d 826, 830 n. 8. Finally, the defendant has not sustained its burden of proof that it could not reasonably have known of the falsity of its representation.

*B. Rule 10b–5, State Law and Common Law Claims*

▆ Our finding that Goldman, Sachs acted at all times in good faith forecloses recovery under § 10(b) or Rule 10b–5. *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

It is not necessary to determine the Foundation's additional claims. Having established a violation of § 12(2) it is entitled to rescind the sale and it is academic whether a case has also been made out under the asserted alternative bases of liability as well.

For the reasons set forth above, the Foundation is entitled to rescind the purchase and recover the consideration paid for the notes plus interest from the date of the sale.

The foregoing constitutes our findings of fact and conclusion of law.

Submit judgment on notice.