Joseph C. CANIZARO

v.

KOHLMEYER & COMPANY.

Civ. A. No. 72–995.

United States District Court,
E. D. Louisiana.

Feb. 6, 1974.

Paul E. Hurley, Hurley & Stassi, Peter J. Butler, Steeg, Butler & O'Connor, New Orleans, La., for plaintiff.

Charles Kohlmeyer, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendant.

HEEBE, Chief Judge:

Plaintiff in this action seeks to recover damages for violations of Section 12(2) of the Securities Act of 1933, (15 U.S.C. § 77l(2)), and 17 C.F.R. § 240.-10b–5 promulgated pursuant to Section 10 of the Securities Exchange Act of 1934, (15 U.S.C. § 78j), in the purchase or sale of securities. We find in favor of the defendant on all counts and make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Kohlmeyer & Company, the defendant herein, is a registered broker-dealer, engaged in the brokerage and sale of securities.

2. Joseph C. Canizaro, the plaintiff, is an experienced businessman and financier and may be considered to be a sophisticated investor. By his own admission, Mr. Canizaro has tended to specialize in speculative acquisitions, with a view toward making quick profits by quickly reselling the purchased securities.

3. On the morning of May 20, 1970, the plaintiff received a telephone call from Murray Peavey, an employee of J. B. Williams & Company, a stock brokerage firm located in Nashville, Tennessee, during which Mr. Peavey offered to arrange a sale to the plaintiff of 18,000 shares of the common stock of Home of Country Furniture, Inc. (hereinafter referred to as HCF) at $7.50 per share.

4. Since the plaintiff had never heard of HCF before this time, he asked Peavey several questions about the stock, principally about its marketability, the identity of the seller and the reasons for the seller wanting to sell. He was told by Peavey that the company was in the furniture business in New York, was given some figures with regard to current earnings, and was advised that the seller was under financial pressure and had to sell the securities immediately in order to raise money. He was further advised that there was a current trading market for the stock which was approximately $13.00 to $15.-00 per share, and that the seller's willingness to sell at substantially less than the current market value was dictated by financial pressure to raise money immediately. The offer was stated to be good for twenty-four hours only.

5. Immediately following his conversation with Peavey, plaintiff called an acquaintance, one Hutchins, who was also employed by J. B. Williams & Company, and received assurances from Hutchins that the deal offered was a "good deal." Hutchins was known to plaintiff to have a bad reputation and plaintiff was wary of the proposal because he did not trust either Hutchins or J. B. Williams & Company.

6. Following his conversations with Peavey and Hutchins, Mr. Canizaro called Robert E. Wilkins, a registered representative at Kohlmeyer & Company with whom he had an account and with whom he had done business over the past several years. He informed Wilkins about the proposed stock offer without indicating to him his doubts concerning Hutchins and J. B. Williams & Company. Wilkins was then asked whether he could handle the transaction and was requested to "check out" the deal and to ascertain the answers to the following questions. 1) Who was the seller of the stock? 2) Was the seller an officer or director of HCF? 3) Were there any SEC restrictions pertaining to the stock in question? 4) What were the current earnings per

share of HCF stock? 5) What was the breadth of the market for HCF stock? 6) What bid and asked prices were reflected in the "pink sheets" published by the National Quotation Bureau for the stock?

7. In view of the testimony adduced at trial and the fact that Canizaro informed Wilkins that this stock offer was good for only twenty-four hours, we find that Canizaro neither requested nor expected any in-depth analysis of HCF or the stock nor did he request or expect any investment opinion concerning the advisability of the stock offer.

8. After this conversation, Wilkins undertook to ascertain the requested information. He contacted Peavey and learned that the seller, Edward Cohen, was neither an officer nor a director of HCF. He further learned that there were no restrictions on the trading of HCF stock. He contacted the president of HCF and obtained from him information pertaining to the earnings of the company. He consulted the "pink sheets" and found that there were five brokerage firms listed as market-makers of HCF stock. Wilkins telephoned Canizaro on the afternoon of May 20 and relayed all of this information to him.

9. On the following morning, May 21, Wilkins telephoned plaintiff again to report that he had determined that a public offering of 100,000 shares of HCF stock had been publicly made in late 1969 at $3.00 per share. He also reported that the oldest market information readily available was April 1, 1970, and from that date to the present the stock had been bid at $9.00 a share or more and was currently quoted at $11.00 bid—$13.00 asked. Wilkins did not consult the "pink sheets" for early March which showed the bid and asked prices for HCF to be 3½ and 4½, respectively.

10. Wilkins then told Canizaro that based upon the information he had obtained, he could see no reason why Canizaro should not make the purchase.

11. Canizaro asked Wilkins to check with one of the partners of Kohlmeyer & Company to determine whether Kohlmeyer & Company could handle the transaction with J. B. Williams & Company, and further instructed Wilkins to offer $7.00 per share for the stock.

12. Wilkins consulted with Herman Kohlmeyer, Jr., a senior partner in the firm, who, in turn, asked Mort Seymour who was in charge of Kohlmeyer's over-the-counter department to "check out" J. B. Williams & Company to see whether Kohlmeyer & Company could handle the transaction. In addition, Herman Kohlmeyer, Jr., and Wilkins determined that a commission of 25¢ per share would be appropriate. This amount is about 3½% of the purchase price, which is below the 5% maximum suggested by the National Association of Securities Dealers whose rules governed this over-the-counter transaction.

13. Seymour learned that J. B. Williams & Company had ceased doing business with the public, possibly at the request of the SEC, but was still transacting business with other brokerage houses. He, therefore, concluded that Kohlmeyer & Company could handle the transaction.

14. Wilkins contacted Canizaro and told him that his $7.00 per share offer had been accepted by the seller of the stock and that Kohlmeyer & Company would handle the transaction at a net price to plaintiff of $7.25 per share. Canizaro instructed Wilkins to confirm the purchase.

15. In view of the fact that J. B. Williams & Company had ceased dealing with the public, Seymour and Herman Kohlmeyer, Jr., decided to insert the following legend on plaintiff's confirmation slip: "THIS IS NOT A BONA FIDE TRD. UNTIL SELLER DEL." This was rarely done but on this occasion Kohlmeyer and Seymour had sufficient doubts about J. B. Williams & Company to merit an extra degree of caution; the legend was designed to insure only that the securities were properly delivered and in negotiable form.

16. At no time prior to the consummation of the transaction was Canizaro told that J. B. Williams & Company had ceased dealing with the public or that Seymour had placed the special legend on the confirmation slip.

17. The transaction was billed out on confirmations which showed the defendant to be acquiring from J. B. Williams & Company as principal and to be selling to the plaintiff as principal. This was done solely because the defendant's accounting records are kept on computer which is programmed to register commissions at the New York Stock Exchange rate on each transaction. Whenever a higher rate is charged, as was the case here, the transaction is simply confirmed on a principal basis and the data is manually fed into the computer although it is clear that the broker has "bought" the stock for the account of its customer.

18. Kohlmeyer & Company had never before dealt in HCF stock nor had any member of the firm even heard of the company before the transaction in question.

19. On May 22, the stock certificates were hand carried by J. B. Williams & Company to New Orleans and were delivered to and paid for by plaintiff.

20. Following plaintiff's acquisition of the securities, orders were placed by plaintiff to sell but those orders were always placed at a price above the then market price and no sale order was executed. Immediately following plaintiff's purchase, the stock was quoted at $16.-00–$17.50 but from that high, the stock dropped abruptly to the range of $3.00–$4.00, and eventually the market disappeared altogether. This sudden decline in market value was attributed to the fact that the stock's principal market maker, First William Street Securities, Inc., located in New York, was forced by either the SEC or the NASD to stop making a market due to violations of the rules pertaining to margin requirements.

21. On or about December 29, 1972, plaintiff sold all the stock to a trust established for his children at 9¢ a share, thereby sustaining a loss of approximately $125,000.00.

22. At no time prior to the consummation of this transaction did Wilkins or any other employee of Kohlmeyer & Company consult HCF's offering circular which had been issued in December 1969 in conjunction with the company's public stock offering. This circular showed that of the 300,000 shares authorized to be issued by HCF, 200,000 were owned by the president of the company. The 100,000 shares offered in 1969 were exempt from registration pursuant to Regulation A, Title 17, C.F.R. § 230.251, et seq., and were offered on a "best efforts only" basis. Although Kohlmeyer & Company did not have a copy of this circular in its New Orleans office, the research department of Kohlmeyer & Company in New York could have obtained one upon request, possibly within several hours.

23. Some time after the market for HCF stock had evaporated, Canizaro requested that Herman Kohlmeyer, Jr., write up a report on the company recommending it to investors and then attempt to sell the stock to the customers of Kohlmeyer & Company. Kohlmeyer refused to accede to Canizaro's request.

## DISCUSSION

The gist of Canizaro's theory of recovery is that Kohlmeyer & Company misstated or omitted to state several material facts in connection with the plaintiff's purchase of the 18,000 shares of HCF which constitutes violations of § 12(2) of the Securities Act of 1933, Rule 10b–5(b), and the law of Louisiana.[1] The plaintiff complains that Wilkins advised him that he could

---

1. Plaintiff in his complaint originally charged the defendant with violating, in addition, § 17(a) of the Securities Act of 1933 and § 15(c) of the Securities and Exchange Act of 1934. However, plaintiff's proposed Findings of Fact and Conclusions of Law make it clear that he no longer relies upon those sections as a basis for recovery.

see no reason why plaintiff should not purchase the HCF stock but failed to disclose certain information which was either known to Wilkins at the time or which Wilkins could have obtained through a more thorough investigation. The only nondisclosed information in the former category was the fact that J. B. Williams & Company, the seller's broker, had ceased transacting business with the public, possibly at the request of the SEC, and that a special legend was therefore placed on the confirmation slip as a precautionary measure. Information in the latter category consisted of the bid and asked prices prior to April 1, 1970, (specifically the fact that in early March the stock had been bid at $3\frac{1}{2}$ whereas from April 1 until the consummation of the sale, the stock had been bid at 9 or more), and the facts contained in the offering circular pertaining to the ownership by the president of HCF of $\frac{2}{3}$ of its authorized stock and of the "best efforts only" offering in 1969, which was exempt from registration pursuant to Regulation A. The plaintiff maintains that Wilkins had a duty to disclose the fact that he had consulted neither the "pink sheets" for March nor HCF's offering circular.

We note at the outset that the conduct proscribed by both § 12(2) and Rule 10b–5(b) is, in many essential respects, the same, at least with respect to the issues raised by this case. Thus, each prohibits the omission to state material facts necessary to make statements which are made, in the light of the circumstances under which they are made, not misleading.

Section 12(2) states:

"Sec. 12. Any person who— . . .

(2) offers or sells a security (whether or not exempted by the provisions of section 3, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

Similarly, Rule 10b–5 states:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

█ One important distinction between the two laws is that under Rule 10b–5, a cause of action is created against "any person," whereas under § 12(2) a cause of action is created only against one who "offers or sells a security." Our initial inquiry, then, in de-

termining whether Canizaro has proved a § 12(2) violation is to decide whether Kohlmeyer & Company offered or sold the stock in question to him. While at first blush this question may appear to be a relatively simple one, our research reveals that, like so much else in the maze of the federal securities laws, the answer is far from clear. We realize, of course, that these terms have been construed ever more expansively so as to effectuate the broad purpose of the Securities Act of 1933 to protect the investing public. However, we hold that a broker who does no more than act solely as the buyer's agent in executing a purchase order and who has neither solicited the order nor recommended the stock, cannot be deemed to be an offeror or seller.

It is clear that the terms "offeror" or "seller" do not refer solely to those who pass title. For example, brokers representing the seller or both parties to a transaction have been held to be offerors or sellers; Cady v. Murphy, 113 F.2d 988 (1st Cir. 1940), cert. den. 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458; Wall v. Wagner, 125 F.Supp. 854, 858 (D.Neb. 1954); similarly, promoters actively participating in a sales effort, Hill York Corp. v. American International Franchises, 448 F.2d 680 (5th Cir. 1971); an attorney who was a party to a solicitation, Katz v. Amos Treat & Co., 411 F. 2d 1046 (2d Cir. 1969); and persons who aided, abetted and conspired in the violation of § 12(2), In Re Caesars Palace Securities Regulation, 360 F.Supp. 366 (S.D.N.Y.1973), have all recently been held to be offerors or sellers. The common thread which ties together these and other cases decided under § 12 is the fact that those held to be offerors or sellers either had some relationship with or connection to the actual seller or participated in some significant way in a sales effort. But "when the broker represents the buyer alone and executes a purely *unsolicited* order, it is difficult to see how he could be considered one who 'sells' even within the meaning of the Securities Act." III Loss, Securities Regulation 1714 (2d ed. 1961). (Emphasis in original)

The Fifth Circuit in Hill York, *supra*, at 693 of 448 F.2d, recently formulated a standard to determine who may be an offeror or seller under § 12:

"We hold that the proper test is the one previously forged by the court in Lennerth v. Mendenhall, supra, [234 F.Supp. 59 (N.D.Ohio, 1964)] '. . . the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?'" 234 F.Supp. at 65.

In the case at bar, the answer to the Fifth Circuit's question must be answered in the negative. First, we do not believe that Kohlmeyer & Company's actions constitute "offering" or "selling" as these words are used in their more traditional sense for although Kohlmeyer & Company's name appears on the confirmation slip as principal, this was done merely as a bookkeeping measure. Kohlmeyer & Company acted solely as Canizaro's agent or representative in the transaction—it neither purchased the stock for its own account nor sold the stock out of its own inventory.[2] Furthermore, Kohlmeyer had had no prior relationship with HCF and had never before dealt in HCF stock. The only profit it made on the transaction was a commission well within the bounds set by the NASD. Thus, the fact that Kohlmeyer & Company's name appears as principal on the confirmation standing alone does not make it a "seller." Turning to the Fifth Circuit's expansive test, we hold that Kohlmeyer &

2. *See*, Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, 57 Cornell L.Rev. 869, 873 (1972); Douglas & Bates, Stock "Brokers" as Agents and Dealers, 43 Yale L.J. 46, 60–61 (1933).

Company's actions were not the proximate cause of Canizaro's loss. The solicitation of the purchase and the recommendation of the stock came from the seller's broker, J. B. Williams & Company in Nashville. Kohlmeyer & Company merely "checked the deal out," answered several of Canizaro's questions as requested and, then, advised Canizaro that based upon the information gathered, he could see no reason why Canizaro should not complete the transaction. Wilkins' actions did not constitute a "substantial factor" in bringing about the plaintiff's purchase, Lewis & McDonald v. Walston & Co., Inc., 487 F.2d 617 (5th Cir. 1973), and therefore under these circumstances we cannot hold Kohlmeyer & Company to be an offeror or seller under § 12(2).

Moreover, assuming, arguendo, that Kohlmeyer & Company did offer or sell the stock to Canizaro, we are convinced that Kohlmeyer & Company did not violate any duty owed to him as defined by either § 12(2) or Rule 10b–5. Canizaro contends that both laws were violated as a result of Kohlmeyer & Company's omission to state material facts necessary to make its statements with respect to the stock, in light of the circumstances under which they were made, not misleading.

Before analyzing the scope of liability under these laws, we emphasize the fact that Wilkins discharged the obligation he had assumed when asked to "check out the deal" for Canizaro and to furnish him with certain specifically requested information. Canizaro did not request a thorough investigation into the stock or HCF and, since he told Wilkins that the offer was good for only twenty-four hours, he could hardly have expected one. The requested information which Wilkins conveyed to Canizaro was accurate and correct. On the basis of that information, Wilkins merely advised Canizaro that he could see no reason why Canizaro should not go through with the deal. He, thus, did not offer any sort of an investment opinion about the prospects of HCF and certainly did not affirmatively recommend the stock to Canizaro. At no time did Wilkins even imply that the HCF stock was a sound investment for Canizaro. Furthermore, Canizaro, a sophisticated and knowledgeable investor, surely well understood the high degree of risk inherent in purchasing a large block of stock at $7.00 or $7.50 per share when the stock was selling on the open market for $11.00–$13.00 per share.

We are, therefore, faced with the question as to whether the securities laws imposed upon Wilkins an independent duty to investigate and disclose in greater depth than as requested by Canizaro. Reported cases dealing with the duties which a broker-dealer owes to his customers, including the case primarily relied upon by Canizaro, Johns Hopkins University v. Hutton, 422 F.2d 1124 (4th Cir. 1970), invariably involve broker-dealers who have actively induced customers to purchase or sell securities on the basis of misrepresentations or misleading information.[3] In such a situation, the law requires that a broker "cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information." Hanly v. Securities and Exchange Commission, 415 F.2d 589, 597

---

3. *See, e. g.,* Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1970); Hiller v. Securities and Exchange Commission, 429 F.2d 856 (2d Cir. 1970); Hanly v. Securities and Exchange Commission, 415 F.2d 589 (2d Cir. 1969); Katz v. Amos Treat & Co., 411 F.2d 1046 (2d Cir. 1969).

(2d Cir. 1969).[4] Thus, a broker who recommends a security or who volunteers an "investment opinion" or makes a prediction in order to effect a sale or purchase must have a reasonable basis for what he tells his customer.[5] The broker's obligation to his customer to investigate and disclose all material facts must surely increase in direct proportion to the degree of his participation in the sale. However, the broker who has not been engaged in attempting to effect a sale or purchase, who has neither solicited the order nor recommended the securities, but who has merely received and executed a purchase order, has a minimal duty, if any at all, to investigate the purchase and disclose material facts to a customer.[6]

In the case at bar, Wilkins, in the course of receiving and executing an unsolicited purchase order, was asked to "check the deal out," to ascertain the answers to certain specific questions and to determine whether the deal could be handled, all within the limited time of twenty-four hours. Wilkins answered each question with accurate information. He refrained from recommending the stock or pressuring Canizaro to purchase. Wilkins knew that Canizaro was an experienced trader in speculative securities. Although he could have made a more thorough investigation which would have revealed the bid and asked prices prior to April 1 and the information in the offering circular, we do not feel that Canizaro expected one, and we hold that neither § 12(2) nor Rule 10b–5 required him to do so. To make a broker liable under these circumstances would make him a virtual insurer of his customers' purchases unless he provided them with every conceivable material fact concerning a stock before they purchased. Phillips v. Reynolds & Co., 294 F.Supp. 1249, 1255 (E.D.Pa.1969).

For the same reasons, we hold that Kohlmeyer & Company's failure to disclose that J. B. Williams & Company, the seller's broker, had ceased dealing

---

4. This standard is derived from SEC Securities Exchange Act Release No. 6721, at 3 (Feb. 2, 1962), cited in Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, *supra*, at 883. The release reads, in pertinent part, as follows:

"[I]t is a violation of the anti-fraud provisions [which include 10b–5] for a broker-dealer to recommend a security unless there is an adequate and reasonable basis for the recommendations and further, . . . such recommendations should not be made without disclosure of facts known or reasonably ascertainable, bearing upon the justification for the recommendation. As indicated, the making of recommendations for the purchase of a security implies that the dealer has a reasonable basis for recommending such securities which, in turn, requires that, as a prerequisite, he shall have made a reasonable investigation. In addition, if such a dealer lacks essential information about the issuer, such as knowledge of its financial condition, he must disclose this lack of knowledge and caution customers as to the risk involved in purchasing the securities without it."

5. *See* annotation of cases in Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, *supra*, at 884, fn. 78.

6. "Most troublesome is the question of which types of recommendations are governed by the reasonable basis rule. A broker can make a recommendation in a variety of situations: as the lead underwriter in a public offering or as a member of the underwriting group, or while operating a boiler room, engaging in a concerted sales effort or distribution, volunteering similar advice at approximately the same time to a limited number of customers, making an isolated recommendation to one customer on his own initiative, answering a customer's request for advice, or, with what is at best an implied recommendation based on silence, receiving and executing an unsolicited purchase order. The broker's duties should diminish in proportion to his participation in the sale of the security.

"Requiring a firm to have a reasonable basis for a recommendation (and hence to conduct an investigation) creates insurmountable practical problems when the firm is not too actively engaged in selling a security. However, no court has gone so far as to apply the reasonable basis rule to an isolated recommendation, whether initiated by the broker or solicited by his customer." Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, *supra*, at 887.

with the public violated no duty owed Canizaro under the circumstances. Canizaro did not ask for any information about J. B. Williams & Company, and specifically failed to apprise Wilkins of his doubts with respect to the firm's reliability and integrity. Wilkins knew that J. B. Williams & Company was neither the underwriter nor a market-maker of HCF stock. The fact that J. B. Williams & Company could deal only through a brokerage house would thus have had little effect on the value of the stock or the advisability of the purchase, and, therefore, could not be considered to be a "material fact." Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963); Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1970). This nondisclosed fact was discovered only in response to Canizaro's asking whether Kohlmeyer & Company could handle the transaction for him. When it was learned that J. B. Williams & Company could still transact business with other brokerage houses, Canizaro was informed that the deal could be consummated. The special legend only insured the physical delivery of the stock certificates prior to payment. We fail to see, and Canizaro does not indicate, how the failure to disclose the information concerning J. B. Williams & Company operated to render misleading any statements made to him.

In summary, we note that Canizaro entered into this transaction with his eyes "wide open," fully appreciative of the high risks involved. Nothing Wilkins told him led him to believe otherwise. The securities laws relied on by Canizaro were surely not designed to impose liability on brokers for losses realized under these circumstances.

Since Canizaro has failed to prove a violation of either § 12(2) or Rule 10b–5, or to prove a case under the applicable Louisiana law,

It is the order of the Court that judgment be entered in favor of the defendant on all counts.