**QUINCY CO–OPERATIVE BANK, Plaintiff,**

v.

**A.G. EDWARDS & SONS, INC. and Jack Concannon, Defendants.**

**Civ. A. 85–2913–MA.**

United States District Court, D. Massachusetts.

Aug. 27, 1986.

Glass & Brand, Robert Glass, Boston, Mass., for defendant A.G. Edwards & Sons, Inc.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This securities fraud action arises out of the sale of bonds that were called sooner, and at a lower price, than the buyer, relying on its broker's assurances, expected. Plaintiff is Quincy Co-Operative Bank (the Bank). Defendants are A.G. Edwards & Sons, Inc. (Edwards), a registered broker-dealer, and Jack Concannon, a broker who worked at Edwards' Worcester office.

Claiming that it was misled about when the bonds could be called, the Bank alleges that defendants violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), and the Massachusetts blue sky law, Mass. Gen.Laws Ann. ch. 110A, § 410. The Bank also alleges several state common-law claims for misrepresentation, negligence and breach of contract. This matter is before the Court on the Bank's motion for summary judgment on all six counts of its complaint. For reasons explained below, this motion is denied.

### I.

In October, 1983, Concannon proposed a bond purchase to Leo Sheehan who, as the Bank's Vice President and Comptroller, handled the Bank's securities portfolio. Concannon suggested the Bank buy first mortgage bonds issued by the Arizona Public Service Co. which paid sixteen percent interest and were due in April, 1987. The bonds were then selling on the secondary bond market at a premium over face value.

Sheehan says that Concannon several times assured him that the bonds could not be called any earlier than April, 1987, and then only at a 105.91 percent of face value. Neither the Bank nor Edwards has been able to locate Concannon, but Edwards says its brokers follow the secondary bond market industry-wide practice of relying on published reference services for information on bonds. Both reference services, Moody's and Standard & Poor's, described

Ronald R. Cloutier, Martin J. Hernon, Warner & Stackpole, Boston, Mass., for plaintiff.

the Arizona Public Service Co. bonds as due in 1992, but callable in April, 1987 at 105.91 percent of face value.

In late October, 1983, the Bank bought Arizona Public Service Co. bonds with a face value of $500,000, paying a $66,250 premium. Edwards placed the order on October 21. Following industry practice, the bonds were delivered and paid for five business days later. On October 28 Edwards received, by computer entry, $500,000 worth of bonds from a broker working for the seller. Immediately, a second computer entry transferred the bonds to Edwards' account with a clearing agent, the Depository Trust Corp.; Edwards already owned $22,000 worth of Arizona Public Service Co. bonds and the new ones were added to its inventory. Edwards then transferred the bonds in its own records to the Bank's account with Edwards. On the Bank's instructions, Depository Trust Corp. transferred the bonds the next business day, October 31, to the account of First National Bank, the Bank's custodian. All these transactions were accomplished by computer entry. Neither the Bank nor its custodian ever physically received the bonds.

The Bank paid Edwards a slightly higher price for the bonds than Edwards itself paid, the $1250 difference representing Edwards' commission for handling the transaction.

A year later, in November, 1984, the bonds were called at face value. An indenture provision allowed Arizona Public Service Co. to call the bonds if real estate it owned was sold under certain conditions. There is no dispute that the bonds were properly called pursuant to this provision. Although the Bank was paid the $500,000 face value of the bonds, and had received $80,000 in interest during the year it held the bonds, it claims that it was misled about when the bonds could be called and could have earned more money in a different investment. The Bank seeks damages of $58,000.

## II.

Section 12(2) creates a right of action for a purchaser who claims the security he or she bought was offered or sold by means of a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact. 15 U.S.C. § 77*l* (2). Section 12(2) also provides that a defendant who can show that he or she "in the exercise of reasonable care could not have known" of the claimed untruth or omission is not liable. *Id.*

Edwards contends that the Bank is not entitled to summary judgment on its section 12(2) claim because there are unresolved disputes over key facts. These include: what Concannon told the Bank and whether it was material; whether Edwards is liable for Concannon's representations; whether the Bank's action is time-barred because the Bank was not duly diligent in discovering the omitted fact; and whether Edwards was careless in recommending the bonds. Edwards also contends that it is not liable because it acted in the transaction merely as a broker on the Bank's behalf and did not sell the bonds to the Bank. Having carefully read the pleadings, affidavits and depositions submitted on this motion, I must conclude that Edwards sold the bonds to the Bank and did so by oral communications which omitted a material fact about the bonds. However, I must also conclude that whether Edwards acted reasonably in relying on unverified information published by investment reference services is a genuine issue of material fact which cannot be decided by summary judgment.

### A.

█ Edwards sold the bonds to the Bank and is a "seller" for purposes of section 12(2), despite Edwards' contention that it acted merely as the Bank's broker.[1]

---

**1.** Edwards half-heartedly suggests that its liability for Concannon's representations to the Bank is a factual issue not resolvable by summary judgment. I am not persuaded. The federal securities acts do not pre-empt the operation of common law agency theories. *In re Atlantic Financial Management, Inc.,* 784 F.2d 29, 32–34 (1st Cir.1986); *Holloway v. Howerdd,* 536 F.2d

A split exists among the circuits on whether a section 12(2) plaintiff must establish privity between himself and the defendant. The Third, Seventh and, arguably, the Ninth Circuits have held that section 12(2) requires privity between the plaintiff-purchaser and defendant-seller. *Collins v. Signetics Corp.*, 605 F.2d 110 (3d Cir.1979); *Sanders v. John Nuveen & Co.*, 619 F.2d 1222 (7th Cir.1980); *cert. denied*, 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981); *Feldman v. Simkins Industries*, 679 F.2d 1299, 1305 (9th Cir.1982). Other circuits have read the term "seller" to include those whose participation in the sale was a "substantial factor in causing the transaction to take place." *Stokes v. Lokken*, 644 F.2d 779, 785 (8th Cir.1981); *Lawler v. Gilliam*, 569 F.2d 1283, 1287 (4th Cir.1978), or those whose actions in connection with the sale proximately caused the injury to the plaintiff. *David v. Avco Financial Services*, 739 F.2d 1057, 1063–68 (6th Cir. 1984); *Pharo v. Smith*, 621 F.2d 656, 664–68 (5th Cir.1980).

The First Circuit has not had recent occasion to rule on this question, but in *Cady v. Murphy*, 113 F.2d 988 (1st Cir.), *cert. denied*, 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940), the court held that a broker who acted as an agent for the seller, or as an agent for both buyer and seller, could be liable as a seller under section 12(2).

Edwards asserts that it acted merely as the Bank's broker arranging the transaction at the Bank's request. Thus, Edwards argues that it was not a seller in either sense: it was not in privity with the Bank, nor was it a substantial factor in bringing about the Bank's purchase.. I am not persuaded.

Edwards did, in fact, pass title to the bonds to the Bank, and so was literally its immediate seller. The records of the transaction show that Edwards bought the bonds from a broker acting for the seller, added them to its account at the clearing agent, then sold them to the Bank at a marked-up price. Edwards' confirmation slip, which it sent to the Bank, indicates that Edwards acted as the principal in the transaction not as the Bank's agent.

Relying on *Canizaro v. Kohlmeyer & Co.*, 370 F.Supp. 282 (E.D.La.1974), Edwards argues that it possessed the bonds only in a "narrow, technical sense," because the entire transaction—from seller's agent to Edwards to the Bank—took place by computerized book entry on a single day; Edwards says this is the only way brokers operating in the secondary bond market can handle transactions and earn their commission.

*Canizaro*, however, differs from the case before the Court in several important respects. There, the plaintiff-purchaser approached the defendant-broker and asked it briefly to investigate a stock and to handle plaintiff's purchase. The broker did not buy the stock for its own account nor sold the stock out of its own inventory. *Id.* at 287. The broker did not own any other shares of the stock on its own account and had never before dealt in the stock. *Id.* Although the confirmation slip indicated the broker had acted as a principal in the transaction, the *Canizaro* court concluded that a "broker who does no more than act solely as the buyer's agent in executing a purchase order and who has neither solicited the order nor recommended the stock, cannot be deemed to be an offeror or seller." *Id.*

690, 695 (6th Cir.1976). Edwards does not dispute that Concannon was its employee in October, 1983 when Concannon persuaded the Bank to purchase the bonds and in its brief points to nothing which would suggest that Concannon was acting outside the scope of his employment.

It is not necessary to engage in a detailed examination of Edwards' potential liability as a "controlling person" under section 15 of the Securities Act of 1933. 15 U.S.C. § 77o. Courts have imposed liability upon brokerage firms for the acts of their employees using common law

principles of agency. *See, e.g., Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1116 (5th Cir.1980); *S.E.C. v. Geon Industries*, 531 F.2d 39, 54–55 (2d Cir.1976); *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1130 (4th Cir.1970). The Bank has shown that Concannon was employed by Edwards as a broker in October, 1983 and Edwards has produced nothing in its pleadings, affidavits or depositions to suggest that Concannon was not an employee and, thus, has not shown that this is a genuine issue of fact.

Here, of course, Edwards, acting through Concannon, approached the Bank, recommended the bonds, and supplied all of the information about the bonds on which the Bank relied in making its decision. Edwards was already dealing in the Arizona Public Service Co. bonds as a broker-dealer. I am convinced that brokers and others who have a substantial role in a securities sale can be considered "sellers" for purposes of section 12(2) liability. Whether Edwards' role as a broker alone would be sufficient to make Edwards a section 12(2) seller without the additional fact that Edwards purchased the bonds and re-sold them to the Bank is something that I need not decide today.

■ Section 12(2) is a regulatory statute whose purpose is to ensure that potential purchasers are given correct, material information before purchasing securities. *Croy v. Campbell*, 624 F.2d 709, 713 (5th Cir.1980). Those who undertake to sell securities are charged with seeing to it that their customers receive that information. Failure to do so either deliberately or through carelessness, results in liability unless the seller is able to prove that he acted reasonably despite the fact that his purchaser received false or misleading information.

It is fully consistent with the underlying purpose of section 12(2) to consider Edwards a "seller" of the Arizona Public Service Co. bonds. Edwards sought out the Bank, recommended the bonds and supplied the Bank with all its information. Absent Edwards, this transaction would not have occurred. And, of course, Edwards bought the bonds for itself, added them to its inventory of Arizona Public Service Co. bonds, albeit briefly, then resold them to the Bank at a marked-up price. The Bank might have been a relatively sophisticated investor, but sophisticated investors no less than naive ones are entitled to receive correct, material information and are entitled to expect that brokers who arrange the sale of securities have made some reasonable inquiry into the truth of what they are saying about the securities.

B.

■ Next, the Bank has shown that Edwards sold the bonds by a series of telephone calls during which Concannon omitted to state a material fact about the bonds which made his other representations misleading.

The Bank asserts that Edwards, acting through its employee Concannon, assured it that the bonds were not redeemable until April, 1987; since the bonds were, in fact, redeemable at any time on the happening of certain events, the Bank says this was an untrue statement of a material fact. Edwards contends that Concannon said only that the bonds could be redeemed in April, 1987; he did not say that the bonds could not be redeemed sooner.

It is true as Edwards points out that Sheehan does not say in his deposition that Concannon assured him the bonds could not be called under any circumstances before April, 1987. Sheehan says he asked Concannon what protection the Bank would have against an early call and Concannon responded that the bonds could be called in April, 1987 at 105.91 percent of face value. Sheehan concluded that this meant the bonds could not be called sooner. Even accepting Edwards' argument, however, Concannon's statements at best omitted "to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(2). The bonds were redeemable in April, 1987, as Concannon said, but given the Bank's concern over early redeemability it was misleading since the Bank reasonably concluded that the bonds could not be redeemed until April, 1987. That Concannon may not have known about the early call provision does not, by itself, relieve him or Edwards of section 12(2) liability because the Bank need not prove scienter. *Hill York Corp. v. American International Franchises*, 448 F.2d 680, 695 (5th Cir.1971).

Neglecting to tell the Bank about the early call provision was certainly an omission of a material fact since it was information about which the "average prudent investor ought reasonably to be informed

before purchasing" the bonds. *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1128 (4th Cir.1970). Whether to invest in the bonds depended on the expected return which turned on when the bonds could be redeemed and at what price.

Edwards asserts that materiality turns on what a reasonable investor would have wanted to know and is, therefore, ill-suited to summary judgment. *See Rogen v. Ilikon Corp.*, 361 F.2d 260, 265 (1st Cir.1966). Edwards also argues that the Bank had no fixed investment policy concerning bonds sold at a premium and that knowing about the early call provision would not have dissuaded the Bank from buying the bonds.

■■■ Edwards misconstrues the materiality requirement. Disclosure of the omitted fact need not have caused a reasonable investor to change his decision for it to be material. *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916, 919–20 (8th Cir.1977); *see TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Rather, it asks only whether an average prudent investor ought to be informed about the information before buying the security. *Hill York Corp. v. American International Franchises*, 448 F.2d at 696; *Gilbert v. Nixon*, 429 F.2d 348, 356 (10th Cir.1970). Where, as here, the facts in questions were so obviously important to the Bank that reasonable minds could not differ as to their materiality, summary judgment is appropriate. *Johns Hopkins University*, 422 F.2d at 1129.

## C.

Edwards contends that the Bank's action is barred by the one-year statutory limitations period because had the Bank taken physical possession of the bonds and read the indenture closely, it would have discovered the early call provision. This argument is unavailing.

■■■ Section 13 of the Securities Act of 1933 provides that an action under section 12(2) must be brought within one year of discovery of the untrue or omitted statement, or within three years of the purchase. 15 U.S.C. § 77m. A plaintiff under section 12(2) is not required to prove due diligence. *Gilbert v. Nixon*, 429 F.2d at 358. All that is required is ignorance of the untruth or omission, *Sanders v. John Nuveen & Co.*, 619 F.2d at 1229, and the Bank was not obliged to verify what Edwards told it about the bonds. *Wigand v. Flo-Tek*, 609 F.2d 1028, 1034 (2d Cir.1980).

The Bank first learned of the early redemption provision in October, 1984 when it received a notice of redemption. The Bank filed its complaint on July 23, 1985, well within the one year period provided by section 13.

## D.

■■■ Edwards raises the statutory affirmative defense that it "did not know, and in the exercise of reasonable care could not have known" of the early redemption provision in the Arizona Public Service Co. bonds it recommended and sold to the Bank. 15 U.S.C. § 77l(2). Concannon, like most other brokers operating in the secondary bond market, relied on investment reference services published by Standard & Poor's and Moody's. The Bank apparently concedes both that the investment services misdescribed the Arizona Public Service Co. bonds, listing their first call date at April, 1987, and that Concannon relied on them. Edwards contends that this was reasonable because the published services are reliable and because it was impracticable to examine the bonds themselves and their indenture agreement. The reasonableness of Edwards' recommendation is an issue of material fact and thus the Bank is not entitled to summary judgment on its section 12(2) claim.

· Section 12(2) provides the seller a defense if he sustains "the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission ..." 15 U.S.C. § 77l(2). The standard applicable to a broker-dealer who recommended the purchase of a security was described as follows in *Hanley v. S.E.C.*, 415 F.2d 589, 597 (2d Cir.1969):

He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on that investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

*Hanley*, 415 F.2d at 597.

 However, the broker's obligation to his customer to investigate and disclose all material facts increases in direct proportion to the degree of his participation in the sale. *Canizaro*, 370 F.Supp. at 289. A broker who has not solicited the order nor recommended the security has "a minimal duty, if any at all, to investigate the purchase and disclose the material facts to a customer." *Id.* On the other hand, an underwriter who purchases and resells all of an issuer's securities, is held to a more rigorous duty of care in investigating the security. *Sanders v. John Nuveen & Co.*, 524 F.2d 1064, 1069–71 (7th Cir.1975), *vacated and remanded*, 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976).[2] In *Davis v. Avco Financial Services* the Sixth Circuit suggested considerations for determining whether a section 12(2) seller has exercised due care in recommending the security and established the statutory affirmative defense. *Davis*, 739 F.2d at 1068. These include the extent of planning and participation in the deal; access to source data; relative skill in ferreting out the truth; pecuniary interest in the completion of the transaction; and, the existence of a relationship of trust and confidence between the plaintiff-purchaser and the defendant-seller. *Id.* See *University Hill Foundation v. Goldman, Sachs & Co.*, 422 F.Supp. 898, 900 (S.D.N.Y.1976) (broker-dealers are required to have a reasonable basis for recommendations made to customers and are obliged to conduct a reasonable investigation of the security's issuer).[3]

---

2. In *Sanders*, a defendant commercial paper dealer was sued by holders of worthless notes for failure reasonably to investigate the issuer, which collapsed when it was discovered that for ten years the principals had engaged in a massive fraud. The Seventh Circuit, in an opinion written by Judge (now Justice) Stevens affirmed the district court's finding that the commercial paper dealer was liable to its customers under Rule 10b–5 because it breached a duty to make reasonable inquiries. The court found that the commercial paper dealer acted as an underwriter of the notes and could not rely merely on published information about the issuer without attempting to verify the data. Because an underwriter has access to more information than a mere broker, "something more than published data must be analyzed if an underwriter is to discharge his duty of investigation." *Sanders*, 524 F.2d at 1071.

The *vacatur* and remand of *Sanders* for reconsideration in light of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) does not affect the Seventh Circuit's discussion of what constitutes reasonable investigation where liability is premised on a statute, such as section 12(2) which does not require the plaintiff to prove *scienter*. *See University Hill Foundation v. Goldman, Sachs & Co.*, 422 F.Supp. 879, 899–900 (S.D.N.Y.1976).

3. *University Hill Foundation* suggests just how fact-bound the determination that a broker-dealer acted reasonably in investigating and recommending a security must be and why it cannot be resolved at summary judgment.

In *University Hill Foundation* plaintiff, the purchaser of two Penn Central notes, sued Goldman, Sachs & Co. which was the exclusive dealer in commercial paper issued by Penn Central, under Section 12(2) seeking rescission when Penn Central went bankrupt. Plaintiff alleged that Goldman, Sachs had impliedly represented that Penn Central was creditworthy and represented also that its opinion was based on a reasonable credit investigation. Following a six-day bench trial, the court found for the plaintiff.

First, the court held that Goldman, Sachs had to be held to a "fairly rigorous standard," *id.* at 900, because it had acted as an underwriter. It enjoyed a close relationship to Penn Central's management and it implicitly warranted the "soundness of its basis for recommending" the commercial paper. *Id.* at 901. Next it concluded that the credit investigation was not unreasonable simply because it was based "upon publicly available information and the unverified representations of management." *Id.* The court distinguished between relying on "unsubstantiated figures or statements" and relying on "certified figures and statements in such documents as annual reports, offering circulars, government filings and industry-wide information services." *Id.*

Included in Goldman, Sachs' credit information were clippings from Moody's Transporta-

■ Ordinarily, questions of reasonable care cannot be decided on a motion for summary judgment; they are, by their nature, fact-bound. This case is no exception. Here, a fact-finder must decide whether a broker acted reasonably in basing his recommendation to buy bonds on unverified information in a published investment reference service. Plainly, this depends on balancing a number of considerations which include the accuracy of the reference services; the extent of Edwards' dealing in the bonds; the difficulty in verifying the published information; and, whether Edwards knew the Bank would not receive the bonds or the indenture agreements. Perhaps the most important consideration is whether Concannon should have suspected from the nature of the bonds that they might be subject to an early redemption provision. If the Bank can establish that mortgage bonds ordinarily have an early redemption provision triggered by the sale of the real estate, it can argue that Concannon ought to have realized that the published information may have been incomplete. Had he done so and inquired further he could have uncovered the early redemption provision.

This Court cannot, of course, resolve this delicate question on a motion for summary judgment. My task is not to decide factual questions, but merely to determine whether triable questions of fact exist. Since I am satisfied that one does, I must deny the Bank's motion for summary judgment on its section 12(2) claim.

### III.

I need not devote lengthy discussion to the Bank's remaining state statutory and common law claims. For the reasons explained above in relation to the section 12(2) claim, summary judgment on the Bank's remaining claims is also denied.

### A.

■ Count II asserts a claim under Mass.Gen.Laws Ann. ch. 110A, § 410. This statute tracks the language of section 12(2) and decisions construing the federal statutory language are applicable to the state statute as well. *See Valley Stream Teachers Federal Credit Union v. Commissioner of Banks,* 376 Mass. 845, 857–58, 384 N.E.2d 200 (1978). Thus, I must conclude that for purposes of section 410 liability, Edwards was a seller who sold the bonds by use of an oral communication which omitted to state material facts but that there is a material factual dispute over the reasonableness of Edwards' actions. Thus, summary judgment is denied on count II.

### B.

■ In count III the Bank claims that Edwards tortiously misrepresented the redeemability of the bonds, though Edwards could have discovered the early redemption provision had it made reasonable inquiry. *See Rice v. Price,* 340 Mass. 502, 506, 164 N.E.2d 891 (1960). The Bank says it is entitled to recover damages even if Edwards did not know about the early redemption provision and acted reasonably in relying on published industry-wide investment services. *Yorke v. Taylor,* 332 Mass. 368, 374, 124 N.E.2d 912 (1955). I cannot agree.

A purchaser of securities may be able to make out a cause of action for misrepresentation absent deliberate fraud on the part of seller. *Carolet Corp. v. Garfield,* 339 Mass. 75, 80, 157 N.E.2d 876 (1959). I am not persuaded, however, that the Bank can recover if it is unable to show that Edwards was at least negligent in failing to verify the information gleaned from the reference services. Deceit may consist of either fraudulent misrepresentation or negligent misrepresentation, but a plaintiff cannot recover unless the defendant somehow acted unfairly or unreasonably. *See*

tion Manual, a service which provides detailed financial summaries on transportation firms. *Id.* at 891. The court concluded, however, that when plaintiff bought its notes there were enough signs that Penn Central was in financial

difficulty to render inadequate Goldman, Sachs' "exclusive reliance on publicly available data and the unverified representations of management." *Id.* at 902.

*Danca v. Taunton Savings Bank,* 385 Mass. 1, 8–10, 429 N.E.2d 1129 (1982); *Anzalone v. Strand,* 14 Mass.App.Ct. 45, 49–50, 436 N.E.2d 960 (1982); *Carolet,* 339 Mass. at 78, 157 N.E.2d 876; *Yorke,* 332 Mass. at 374, 124 N.E.2d 912. Whether Edwards was negligent turns on precisely the same questions raised by the Bank's section 12(2) claim or, more exactly, Edwards' statutory defense to that claim. Because this is a question of fact best left to a fact-finder, the Bank's motion for summary judgment must be denied.

### C.

In counts IV and VI the Bank asserts claims for negligence (count IV) and breach of duty (VI). It is not at all clear from the complaint why the Bank pleaded these as two separate counts. The Bank does not specify in count IV what duty of care it claims Edwards breached by its negligence. Similarly, in the complaint the Bank does not identify what duty of care it alleges Edwards breached.

The Bank's memorandum in support of its motion for summary judgment offers little assistance. There, the Bank asserts that if Edwards was acting in the bond transaction as its agent, it owed the Bank a duty of care in carrying out its agency which Edwards breached by buying bonds redeemable much sooner than the Bank expected. If that is the Bank's theory, it is not entitled to summary judgment.

■ Inconsistent allegations in a complaint are, of course, permissible. However, when a party moves for summary judgment it asserts that there is no dispute as to the material facts and that it is entitled to judgment as a matter of law and it must adopt a consistent view of the facts.

■ In support of its section 12(2) claim the Bank contends that Edwards, acting as a principal and not as an agent for the Bank, sold the Bank the bonds. The Bank can hardly now claim, in the same summary judgment motion, that Edwards was acting, in fact, as its agent. Thus, the factual predicate for the Bank's negligence and breach of duty claims is missing and it

cannot prevail on its motion for summary judgment on counts IV and VI. Although Edwards did not file a cross-motion for summary judgment, this Court, acting on its own, will grant summary judgment on those counts in Edwards' behalf. *See Landry v. G.B.A.,* 762 F.2d 462, 464 (5th Cir. 1985); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 2720, at 29–33 (2d ed. 1983).

### D.

■ Finally, the Bank seeks summary judgment on count V which alleges that Edwards breached its contract with the Bank. Relying on *Carolet,* the Bank asserts that Concannon's representations were an express warranty that the bonds would not be redeemed before April, 1987 made in connection with the contract to sell the bonds. Because this statement proved false, the Bank concludes that it is entitled to summary judgment. I must disagree.

In *Carolet,* defendants furnished the purchaser of corporate stock and debentures with a written statement of the corporation's financial condition which turned out to contain a number of misstatements and omissions. The court treated the financial statement as an express warranty.

Here, Concannon's representations were never reduced to writing. Instead, the Court has only the affidavit and deposition of Sheehan, the Bank's securities portfolio manager, who says Concannon told him the bonds could not be called until April, 1987. Concannon's version of what he told Sheehan is not available to the Court because he has to be served or deposed. Sheehan's deposition is less certain than his affidavit. In the latter, Sheehan insists that Concannon twice assured him the bonds could not be called under any circumstances before April, 1987. In his deposition, Sheehan says Concannon told him that the bonds were callable in April, 1987 and from that Sheehan concluded that the bonds could not be called before April, 1987.

The Bank may well be correct that, in the context of the Sheehan-Concannon conversations, Concannon's statements plainly meant what Sheehan concluded they

meant. But assuming that the Bank is correct that it can recover damages for breach of an express warranty, this Court is unwilling to grant summary judgment on such a claim based only on Sheehan's somewhat inconsistent account of the critical conversations.[4]

### Conclusion

Accordingly, the Bank's motion for summary judgment on all six counts of its complaint is denied. Summary judgment is granted, however, in behalf of Edwards on counts IV and VI. This case will proceed to trial on the remaining counts, that is, counts I, II, III and V.

SO ORDERED.

---

**4.** Edwards argues against summary judgment on the section 12(2) claim on this same basis, that is, that it is impossible to determine whether Concannon made an untrue statement of material fact because it is unclear exactly what he said to Sheehan. While that may be true, this Court concluded that in any event both sides agree that Concannon did not tell Sheehan about the early redemption provision triggered by sale of real estate. Whatever Sheehan concluded from what Concannon told him about the April, 1987 redemption provision, it was misleading because Concannon omitted to tell Sheehan about the early redemption provision.